1
2
3
4
5
6
7
8                           UNITED STATES DISTRICT COURT

9                          CENTRAL DISTRICT OF CALIFORNIA

10

11   MICHAEL CANTU,                    )   CASE NO. CV 14-00219 MMM (JCGx)
                                       )
12              Plaintiff,             )   FINDINGS OF FACT AND CONCLUSIONS
                                       )   OF LAW
13        vs.                          )
                                       )
14   THE UNITED STATES OF AMERICA,     )
                                       )
15              Defendant.             )
                                       )
16   _____  )
                                       )
17   THE UNITED STATES OF AMERICA,     )
                                       )
18              Counterclaimant,       )
                                       )
19        vs.                          )
                                       )
20   MICHAEL CANTU,                    )
                                       )
21              Counterdefendant.      )
                                       )
22   _____  )

23        On January 9, 2014, Michael Cantu filed this action against the United States of America and

24   United States Customs and Border Patrol ("CBP") supervisory officer Owen Takeshi Teruya.[1]  On April

25   10, 2014, the United States of America (the "government")  was substituted as defendant for Officer

26

27   _____

28        [1]Complaint, Docket No. 1 (Jan. 9, 2014).

1  Teruya pursuant to 28 U.S.C. § 2679(d)(2).[2]  On April 21, 2014, the government answered the complaint

2  and filed a counterclaim against Cantu.[3]  Cantu filed an answer to the counterclaim on May 9, 2014.[4]

3  On May 4, 2015, the counterclaim was dismissed pursuant to the parties' stipulation.[5]

4      Cantu's negligence claim was tried to the court on May 5 and 6, 2015.[6]  Following the trial, both

5  parties submitted post-trial briefs detailing what they believed the evidence had established.[7]  Having

6  considered the evidence and the parties' arguments, the court makes the following findings of fact and

7  conclusions of law under to Rule 52(a) of the Federal Rules of Civil Procedure.

8

9                          **I. FINDINGS OF FACT**

10      **A.      The Parties**

11  1.   Michael Cantu has worked as a longshoreman at the Port of Long Beach in Long Beach,

12       California, and has been a member of the International Longshoreman Warehouse Union

13       ("ILWU") Local 13 since 2000.[8]  Cantu is currently a Class A longshoreman; this followed

14

---

15      [2]Notice of Substitution of the United States for Defendant Owen Takeshi Teruya, Docket No.
16  9 (Apr. 10, 2014).

17      [3]See Answer to Complaint, Docket No. 12 (Apr. 21, 2014); Counterclaim against
    Counterdefendant Michael Cantu, Docket No. 13 (Apr. 21, 2014).

18
    [4]Michael Cantu's Answer to Counterclaim, Docket No. 20 (May 9, 2014).
19
20      [5]Order Approving Stipulation for Compromise Settlement and Dismissal of Counterclaim Only,
    Docket No. 65 (May 4, 2015).  See also Stipulation for Settlement and Dismissal of Counterclaim Only,
21  Docket No. 62 (May 4, 2015).

22      [6]Minutes of Court Trial (1st Day), Docket No. 68 (May 5, 2015); Minutes of Court Trial (2nd
    Day), Docket No. 69 (May 6, 2015).
23
24      [7]Post-Trial Brief by Defendant The United States of America ("Government Brief"), Docket No.
    81 (June 5, 2015); Post-Trial Brief and Summary of Evidence by Plaintiff Michael Cantu ("Cantu
25  Brief"), Docket No. 82 (June 7, 2015).  The parties also filed proposed findings of fact and conclusions
    of law. (See [Proposed] Post-Trial Findings of Fact and Conclusions of Law of Defendant United States
26  of America, Docket No. 80 (June 5, 2015); Notice of Lodging  [Proposed] Findings of Fact and
    Conclusions of Law of Plaintiff Michael Cantu, Docket No. 83 (June 7, 2015).)
27
28      [8]Reporter's Transcript of Court Trial, May 5 at 8:38 a.m. ("May 5 Morning RT"), Docket No.
    77 (May 28, 2015) at 29:22-30:9; 74:12-15; 86:22-25.

service as a Class B longshoreman for three years.[9]  As a Class A longshoreman, Cantu regularly engaged in physical activity, such as loading and unloading trains and shipping containers, locking shipping containers together, climbing up ocean-going vessels and railcars, and lifting objects heavier than thirty-five pounds.[10]

2.   Officer Owen Teruya is a Supervisory Customs and Border Protection officer employed by the United States Department of Homeland Security: Customs and Border Protection ("CBP").[11] Teruya has been employed by CBP for twenty-six years.[12]  For the last eighteen years, he has been with the CBP's Antiterrorism and Contraband Enforcement Team in Carson, California.[13] The Antiterrorism and Contraband Enforcement Team is primarily charged with interdicting illegal narcotics passing through seaports between Dana Point, California, and San Luis Obispo, California.[14]  As a member of the team, Teruya has typically supervised twelve CBP officers on two enforcement teams that work almost daily at the Los Angeles and Long Beach seaport complexes.[15]  While at the ports, Teruya and his team search containers and ocean-going vessels; they also conduct surveillance and scan shipping containers for indicia of narcotics or terrorist influence.[16]

**B.     The Stevedore Services of America Terminal**

3.   The Stevedore Services of America ("SSA") Terminal (the "Terminal") is located at Pier A in

---

[9]*Id.* at 29:24-30:7.

[10]*Id.* at 30:22-32:7; 33:21-34:23.

[11]Reporter's Transcript of Court Trial, May 5 at 1:32 p.m. ("May 5 Afternoon RT"), Docket No. 74 (May 20, 2015) at 254:2-15.

[12]*Id.* at 254:16-17.

[13]*Id.* at 254:21-23; 256:1-2.

[14]*Id.* at 255:5-11, 21-25.

[15]*Id.* at 255:3-4, 21-25; 261:9-21.

[16]*Id.* at 255:8-20.

the Port of Long Beach.[17]   The Terminal comprises approximately 200 acres, on which thousands of large metal shipping containers are stored before and after they are loaded onto or off ships, trains, and semi-trucks.[18]

4.   The Terminal contains "Breakways," which are paved roadways that run north and south between the Terminal's main entrance to the north and the waterline to the south.  It also has "Rows," which are paved roadways that run east and west between the shipping containers.[19]

5.   Breakway 100 is approximately 60 feet wide.  It has no traffic controls, stop signs, or stop lines.[20]

6.   Row S-200 is the first Row to intersect Breakway 100 after one comes through the main entrance to the Terminal.[21]  It is approximately 30 feet wide and, like all other Rows, has a stop line for eastbound and westbound traffic at its intersection with Breakway 100.[22]

7.   The Terminal has a speed limit  of 15 miles per hour that is applicable to all drivers.  Kirk Wargo, the Yard Superintendent at the Terminal, testified that, since at least 2006, there has been a speed limit at the Terminal of 15 miles per hour.[23]  Wargo stated that this speed limit has been posted at the entrance gate to the Terminal, a gate through which all vehicles must pass and that it has been communicated to the drivers of all vehicles entering the Terminal, including CBP officers.[24]  Wargo stated that the speed limit applies to all individuals operating vehicles on

---

[17]Final Pretrial Conference Order ("Pretrial Order"), Docket No. 48 (Apr. 6, 2015) at 2, Stipulated Fact ("SF") 2.

[18]SF 2.

[19]SF 4, 6.  See also Exh. 156.

[20]SF 4-5.  See also May 5 Afternoon RT at 250:6-12, 262:19-263:6; Reporter's Transcript of Court Trial, May 6 at 8:41 a.m. ("May 6 Morning RT"), Docket No. 78 (May 28, 2015) at 302:15-25.

[21]Exh. 156.

[22]SF 7.  See also May 5 Afternoon RT at 250:8-14; 263:7-12.

[23]May 5 Morning RT at 105:18-106:6.

[24]*Id.* at 106:12-23, 108:2-9.

Terminal property.[25]  Cantu similarly testified that the Terminal had a 15 mile per hour speed limit that applied to all drivers.[26]  Although Officer Teruya and Officer Canaria, the Long Beach police officer who responded to the accident involving Cantu and Teruya, testified that they did not recall seeing a speed limit sign posted in the Terminal,[27] neither man's testimony contradicts Wargo's statement, which the court finds to be credible, that the speed limit at the Terminal was 15 miles per hour and that every individual entering the Terminal passed by a sign advising them of this fact.

C.     **The Accident**

1.     **General Facts**

8.     The automobile accident giving rise to this litigation occurred at approximately 7:50 a.m. on April 18, 2011.[28]

9.     The accident occurred at the intersection of Breakway 100 and Row S-200.[29]

10.    At the time of the accident, Officer Teruya was traveling southbound on Breakway 100 in a 2008 Ford Explorer owned by the CBP.[30]  Teruya had entered through Gate 1 at the northwest corner of the Terminal, turned right onto Breakway 100 after stopping at a stop line, and traveled approximately 135 feet southbound prior to the collision.[31]

11.    Teruya was acting in the course and scope of his employment with the CBP at the time of the accident.[32]

---

[25]*Id.* at 111:12-112:11.

[26]*Id.* at 90:18-21.

[27]May 5 Afternoon RT at 240:17-22, 256:22-257:6.

[28]SF 1.

[29]SF 3.

[30]SF 15-16.

[31]May 5 Afternoon RT at 261:1-8; Reporter's Transcript of Court Trial, May 6 at 1:16 p.m. ("May 6 Afternoon RT"), Docket No. 75 at 392:25-393:2.

[32]SF 17.

12. Cantu was traveling westbound on Row S-200 in a 1998 Ford Ranger pickup truck owned by SSA immediately prior to the accident.[33]

13. Cantu was acting in the course and scope of his employment as a longshoreman for SSA at the time of the accident.[34]

14. On the date of the accident, a 45 foot long, 8 foot wide, 10 foot high metal shipping container was located at the northeast corner of Breakway 100 and Row S-200 intersection, i.e., immediately to Cantu's right as he arrived at the intersection.[35] The container was parallel to Breakway 100 and perpendicular to Row S-200.[36] The container was located approximately six inches west of the stop line, such that it extended approximately 8.5 feet into Breakway 100.[37]

15. As Cantu approached the stop line at the intersection of Row S-200 and Breakway 100, the shipping container to his right was positioned so that he could not see southbound traffic on the breakway.[38]

16. The evidence as to whether Cantu stopped at the stop line at the Row S-200/Breakway 100 intersection is conflicting. Cantu testified that he stopped when he reached the intersection; he could not say, however, whether he stopped "on the line."[39] Cantu's expert accident reconstructionist, Christopher Brignola, testified that based on Cantu's purported speed at the time of the collision and other facts, it was likely that Cantu did not come to a complete stop at the intersection, but rather performed a rolling stop, or a "California stop."[40] Likewise, Gregory

---

[33]SF 12-14.

[34]SF 14.

[35]SF 8, 10.

[36]SF 9.

[37]SF 11.

[38]May 5 Morning RT at 95:7-13; May 5 Afternoon RT at 242:5-7.

[39]May 5 Morning RT at 44:20-23.

[40]May 5 Morning RT at 119:14-22. See also May 5 Afternoon RT at 144:18-25 ("Q. So then is it fair to say [ ] as you sit here today your testimony is changed that you actually do agree that Mr. Cantu

Peck, the government's accident reconstruction expert, testified that based on his post-collision analysis, Cantu did not stop at the stop line.[41]

17. Given the equivocal nature of Cantu's testimony, the court credits the testimony of the parties' respective experts and concludes that Cantu did not come to a complete stop at the Row S-200 intersection prior to entering Breakway 100.

18. Cantu's was the first vehicle to enter the intersection.[42]

19. As Cantu entered Breakway 100 and began to cross, he noticed Teruya heading southbound.[43]

20. As Teruya approached Row S-200, he was not looking forward, but rather was looking down and to his right, i.e., towards the west side of the intersection.[44]  Teruya testified that he was looking down and to his right so that he could look underneath the chassis of tractor trailers that were parked along the northwest edge of the intersection.[45]  The tractor trailers were parked along the north edge of Row S-200 as it proceeded west after the intersection with Breakway 100, and were parked perpendicular to Row S-200.[46]

21. The front of Teruya's Ford Explorer collided with the right rear of Cantu's Ford Ranger.[47]  The collision occurred approximately 49.5 feet into Breakway 100 from the stop line for westbound

---

did not stop at the stop line?  A. It's hard for me to answer that based on the stop line.  The rolling stop – I believe that the rolling stop was performed at or before he reached the stop line.  But do I believe that he came to a full stop?  No.  And I hope that answered your question").

[41]May 6 Afternoon RT at 424:19-425:20.  Peck, however, also opined that it was not possible that Cantu performed a rolling stop at the intersection based on his calculations regarding Cantu's speed at the time of the collision.  (See id. at 425:21-426:20.)  The court need not resolve this dispute between Brignola's and Peck's testimony, however, as, in combination, their testimony is sufficient to demonstrate that Cantu did not come to a complete stop at the stop line.

[42]May 5 Morning RT at 45:3-10.

[43]Id.

[44]Id. at 45:8-17; May 5 Afternoon RT at 266:1-12.

[45]May 5 Afternoon RT at 266:1-268:5; May 6 Morning RT at 293:9-16; id. at 304:6-21.

[46]Exhs. 193, 194.

[47]SF 19.

traffic on Row S-200.[48]  The impact point on the Explorer was the front bumper on the passenger side; the impact point on the Ranger was the back half of the truck on the passenger side.[49]

22.  Cantu accelerated immediately before the collision.[50]

23.  As the collision occurred, Teruya applied the brakes.[51]

24.  At the time of impact, Cantu was traveling between 24 and 32 miles per hour.  Teruya was traveling between 17 and 21 miles per hour.[52]

25.  Following the collision, Cantu's Ranger spun clockwise and rolled onto its roof where it ultimately came to rest in the westbound lane of Row S-200 west of the intersection with Breakway 100.[53]

26.  Cantu was wearing a seatbelt at the time of the collision; as a result, he remained secured in his seat as his vehicle spun and rolled over.[54]

27.  Teruya immediately pulled his Explorer out of Breakway 100 and attempted to assist Cantu.[55]

28.  Cantu crawled out of his vehicle without assistance.[56]  He was not bleeding or in any apparent pain and walked around the accident scene.[57]  Teruya testified that, in response to his inquiry,

---

[48]May 5 Morning RT at 147:2-5; May 6 Afternoon RT at 426:21-427:14.

[49]May 6 Morning RT at 298:10-299:9; May 6 Afternoon RT at 441:12-444:1.

[50]May 5 Morning RT at 45:15-21.

[51]May 5 Afternoon RT at 264:2-12.

[52]Cantu's accident reconstruction expert opined that Teruya was traveling between 17 and 21 miles per hour at the time of collision and that Cantu was traveling 24 to 27 miles per hour.  (See May 5 Morning RT at 119:4-6, 14-22.)  The government's expert determined that Teruya was traveling 21 miles per hour and Cantu was traveling 32 miles per hour.  (See May 6 Afternoon RT at 415:9-22.)

[53]See May 5 Morning RT at 46:4-21; id. at 118:3-9; May 5 Afternoon RT at 241:20-242:4; id. at 264:12-20;  May 6 Afternoon RT at 421:22-422:12.  See also Exhs. 190, 191, 193, 195.

[54]May 5 Morning RT at 46:18-19.

[55]May 5 Afternoon RT at 264:14-20.

[56]May 5 Morning RT at 96:7-15; May 5 Afternoon RT at 264:13-20.

[57]May 5 Morning RT at 96:22-23; May 5 Afternoon RT at 264:22-265:13.

1     Cantu said he was "okay" and was not injured.[58]

2               **2.**     **Officer Canaria's Investigation**

3    29.    Paramedics from the Long Beach Fire Department and officers from the Long Beach Police

4           Department ("LBPD") were immediately called to the Terminal following the accident.[59]

5    30.    Officer Dennis Canaria was one of two LBPD officers who responded to the accident scene.[60]

6           Canaria, who testified at trial,[61] has been a police officer with the City of Long Beach for 22

7           years and has been assigned to LBPD's Port Police Division for nearly nine years.[62]   In that

8           capacity, he is charged with patrolling the Port of Long Beach, its waterways, and its terminals,

9           responding to accidents, undertaking accident investigations, and issuing traffic citations.[63] Over

10         the course of his career, Officer Canaria has investigated approximately 200 traffic accidents,

11         30 or 40 of which occurred at the Port of Long Beach.[64]

12    31.    After arriving at the Terminal, Officer Canaria was escorted to the accident scene by an SSA

13           security guard.[65]   Once there, he began his investigation  and interviewed both Cantu and

14           Teruya.[66]   During his interview, Cantu told Canaria he was suffering back pain.[67]   In addition to

15

16     [58] May 5 Afternoon RT at 264:21-24.

17     [59] SF 23.

18     [60] SF 24.

19     [61] The government offered Officer Canaria at trial as a non-retained expert in accident

20 investigation and the California Vehicle Code. (May 5 Afternoon RT at 231:20-23.) Cantu objected to Canaria testifying as a witness and examined him on *voir dire*. (*Id.* at 231:24-234:11.)  The court

21 permitted Canaria to testify as a percipient witness based on the observations regarding the accident that were set forth in his traffic collision report.  (*Id.* at 234:12-17.)

22

23     [62] May 5 Afternoon RT at 229:3-18, 231:8-12.

24     [63] *Id.* at 229:16-231:7.

25     [64] *Id.* at 231:13-19.

26     [65] *Id.* at 238:1-6.

27     [66] *Id.* at 238:20-239:23.

28     [67] *Id.*

interviewing Cantu and Teruya, Canaria took measurements to determine the point of impact ("POI") of the two vehicles, point of rest ("POR") of Cantu's vehicle, and the skid and yaw marks made by Cantu's vehicle.[68] He also walked Teruya's path of travel on Breakway 100 and Cantu's path of travel on Row S-200 to identify each driver's viewpoint and any visual obstructions in the driver's line of sight.[69]

32. After interviewing Cantu and Teruya and completing his investigation, Officer Canaria concluded that Teruya, proceeding southbound on Breakway 100, had the right-of-way; this is because there was a stop line on Row S-200 at the intersection while there was no traffic control device on Breakway 100.[70] Canaria also concluded that Cantu had caused the accident by failing to yield the right-of-way to Teruya and failing properly to clear the visual obstruction – i.e., the shipping container to his right that extended into Breakway 100 – before entering the intersection.[71] In reaching this conclusion, Canaria did not determine or rely on the speed at which either Cantu or Teruya was traveling.[72] He similarly did not consider Cantu's statement that Teruya was looking down as he approached the intersection.[73]

### 3. The Parties' Expert Witnesses

#### a. Christopher Brignola, MSME

33. Cantu called Christopher Brignola as an expert witness. Brignola is a mechanical engineer who is currently employed by Vollmer-Gray Engineering Labs. He graduated from Drexel University in Philadelphia, Pennsylvania, with a bachelor's degree in mechanical engineering

---

[68]*Id.* at 241:9-243:9.

[69]*Id.* at 243:1-9.

[70]*Id.* at 250:6-251:13.

[71]Exh. 221 at 7. The court admitted page seven of Officer Canaria's traffic collision report over Cantu's objection under Rule 803(8) of the Federal Rules of Evidence. (See May 5 Afternoon RT at 252:14-23.)

[72]May 5 Afternoon RT at 251:14-19.

[73]*Id.* at 251:23-252:8.

and thereafter obtained a master's degree in mechanical engineering from California State University – Long Beach.  At Vollmer-Gray, Brignola works primarily as a consultant, providing litigation support in cases involving accidents such as this one.[74]

34.   Brignola is qualified to testify as an expert in accident reconstruction.

35.   Cantu retained Brignola to analyze the physical evidence and testimony and determine how the accident with Teruya occurred.  In formulating his opinions, Brignola reviewed the deposition testimony of Cantu, Wargo, Teruya, and Canaria, as well as various interrogatories and Society of Automotive Engineering references.  He also visited the accident scene on November 25, 2014, at which time he took measurements and photographs.[75]

36.   Based on his investigation, Brignola concluded that Teruya was traveling between 17 and 21 miles per hour at the time of impact.  He opined that Teruya was likely traveling at a speed of 23 to 30 miles per hour in the moments preceding the impact; Brignola testified that this conclusion was based on Teruya's deposition testimony that he applied his brakes just he hit Cantu's vehicle.[76]

37.   Brignola testified that Cantu was traveling 24 to 27 miles per hour at the moment of collision and that his vehicle had slowed to a speed of 11 to 17 miles per hour when it rolled onto its top.[77] At his deposition, Brignola testified that the conclusions in his expert report concerning Cantu's speed were based on his assumption that Cantu stopped at the stop line prior to entering the intersection.[78] On cross-examination at trial, Brignola conceded that his conclusions concerning Cantu and his vehicle would be inaccurate if his assumption that Cantu had stopped at the stop

---

[74]May 5 Morning RT at 114:12-115:14.

[75]*Id.* at 115:17-118:6.

[76]*Id.* at 118:7-121:23.

[77]*Id.* at 119:17-120:17.

[78]May 5 Afternoon RT at 139:4-140:20.

line was wrong.[79]  He also stated that in addition to considering Cantu's testimony that he came to a complete stop at the stop line, he took into account the possibility that Cantu might have performed a rolling stop at the stop line.[80]

38.   Brignola stated that, based on his measurements, Cantu entered the intersection before Teruya reached it and that, had Teruya been looking forward, he would have been able to see Cantu's vehicle approximately 50 to 70 feet before reaching the point of impact.[81]  He opined that, at that distance, Teruya would have been able to avoid a collision with Cantu's vehicle had he turned the steering wheel slightly to the left or applied the brakes.[82]  Brignola's opinion in this regard was based on his calculation of the time Teruya would have had to react to the sight of Cantu's vehicle entering the intersection.  Based on his calculation that Teruya was traveling at approximately 21 miles per hour, Brignola estimated that Teruya would have traveled the 70 feet from the point at which he could first have seen Cantu's vehicle to the point of impact in 2.3 seconds.  After taking into account Teruya's perception reaction time of 1.5 seconds,[83] Brignola testified that Teruya would have had 0.8 seconds to apply the vehicle's brakes or steer the vehicle to the left to avoid a collision with Cantu.  He opined that, had Teruya been traveling at a speed of 15 miles per hour, he would have seen Cantu's vehicle approximately 3.2 seconds prior to impact, leaving him approximately 1.7 seconds to react and avoid the collision.[84]

39.   Brignola did not perform a photogrammetry analysis in preparing his opinions.  Photogrammetry is a technique in which engineers take measurements of an accident scene from various

---

[79]*Id.* at 141:1-142:22.

[80]*Id.* at 142:23-143:8, 144:11-146:9, 149:6-19.

[81]May 5 Morning RT at 122:11-22.

[82]*Id.* at 122:14-123:9, 124:4-22.

[83]The "perception reaction time" is the amount of time that passes between the time that an individual first perceives something and the time at which the individual is able to react to its presence. (*Id.* at 133:21-134:4.)  Brignola opined that 1.5 seconds is the generally accepted perception reaction time in accident reconstruction which can be applied to all drivers in all situations.  (*Id.* at 133:4-9.)

[84]May 5 Afternoon RT at 133:1-134:23.

photographs and use those calculations to reconstruct the accident. Brignola did not perform a photogrammetry analysis because the photographs he was given were black and white and of such low quality that the accuracy of the analysis would have been below a 95 percent competence.[85]

40.     Brignola likewise did not perform a post-collision analysis of the accident.[86] A post-collision analysis is performed by using simulation programs to calculate a vehicle's behavior following a collision.[87]

### b.     Gregory Peck, MSME

41.     The government designated Gregory Peck as an expert in accident reconstruction. Peck is currently a forensic engineer at Dial Engineering in Culver City, California, and has served in that capacity since 2004. Peck also owns a business called Lightpoint Scientific; through Lightpoint, he conducts photogrammetry analysis of accidents throughout the country. Peck received a bachelor's degree in mechanical engineering from California State University, Fresno, and a master's degree in mechanical engineering from Worcester Polytechnic Institute ("WPI") in Worcester, Massachusetts. After receiving a graduate degree from WPI, Peck took two months of post-graduate courses in collision investigation and accident reconstruction.[88] Peck is a member of the American Society of Mechanical Engineers, the Society of Automotive Engineers, and the California Association of Accident Reconstruction Specialists. He has also been accredited by the Accreditation Commission for Traffic Accident Reconstruction

---

[85]*Id.* at 135:11-137:9.

[86]*Id.* at 149:21-150:9.

[87]*Id.* at 150:4-9 ("THE COURT: What does a post-collision analysis consist of? [MR. BRIGNOLA:] It would be once the vehicles come together allowing the simulation program to tell you where they end up. But the data in this case isn't conducive to doing that"); May 6 Afternoon RT at 417:16-24 ("[MR. PECK]: A. Yes, exactly. That's where we start. You know, we start by figuring out what happened after the cars collide, after the vehicles collide; and then we go backwards from there. So this is the definition of a post-impact analysis where having the vehicles collide and checking out the post-impact behavior").

[88]May 6 Morning RT at 376:18-379:16.

("ACTAR") since 2007.[89]

42.  As a forensic engineer, Peck's primary work is analysis of mechanical failures in automotive collisions.  As a photogrammetry consultant, he uses photographs that are taken of an accident scene or damage to a vehicle, and runs them through a computer program called PhotoModeler.  After PhotoModeler analyzes the photographs, Peck is able to extract three-dimensional information about the damage that is reflected in the photographs.[90]  Peck has worked as an accident reconstruction expert more than 2,000 times since 2004.[91]

43.  Since 2004, Peck has given presentations related to human factors analysis and perception-response time ("PRT") analysis,[92] and has published technical articles on these subjects.[93]

44.  Peck is qualified as an expert in accident reconstruction.[94]

45.  The government retained Peck to determine how the collision between Cantu and Teruya occurred.  In forming his opinions, Peck reviewed written discovery propounded during the litigation, depositions, photographs, and Officer Canaria's traffic collision report.  He also inspected the collision site and the damage done to Teruya's Ford Explorer.[95]

46.  Peck testified that the first thing that he did was review the parties' respective deposition

--------

[89]*Id.* at 379:17-381:15. ACTAR is an internationally recognized accreditation program that was developed in response to a report by the National Highway Transportation Safety Administration ("NHTSA"). NHTSA identified the need for minimum training standards for accident reconstructionists and the need to develop an accreditation program. To secure ACTAR accreditation, an individual must submit an extensive application and examples of his or her prior accident reconstruction reports. The candidate must also pass an eight-hour full-day examination that has theory-based and practical components. After being accredited, an individual must take a certain amount of continuing education to maintain the accreditation. (*Id.* at 380:1-381:9.)

[90]*Id.* at 376:23-377:9.

[91]*Id.* at 381:25-382:4.

[92]Perception-response time analysis involves the study of how long it takes a given individual to respond to a hazard. (*Id.* at 381:16-18.)

[93]*Id.* at 381:10-24.

[94]*Id.* at 382:5-8.

[95]*Id.* at 382:10-383:20.

testimony, Officer Canaria's report, and more than ten high quality color photographs of the accident scene taken shortly after the accident.[96]  The reason he reviewed the photographs was to identify various locations that existed at the time of the accident and that would likely still exist when he visited the accident scene.  Peck explained that it was critical to identify these points of reference so that he could take accurate measurements for purposes of the photogrammetry analysis.  He stated that he was able to identify 25 to 30 reference points for each of the two photographs he used in the photogrammetry analysis; this far exceeds the six or seven points typically required for accurate analysis.[97]

47.   When Peck conducted a site inspection in November 2014, he and his associates measured the points of references he had identified from the photographs using a 3-D laser scanner and a total station, which is often used by construction crews for taking measurements.  Peck also took photographs of the accident site, and documented the POI and POR identified by Officer Canaria.[98]

48.   Based on measurements taken at the accident scene, Peck conducted a post-collision analysis to determine the cause of the accident.  A post-collision analysis involves relying on objective data to "work backwards" from a vehicle's final resting point to recreate a collision and ascertain, *inter alia*, the speeds of the vehicles involved in the collision.

49.   Peck first used the measurements taken at the accident site and gleaned from the photographs to create a 3-D environment.  After creating a 3-D environment, Peck used photogrammetry to determine the final resting place of Cantu's vehicle, the yaw mark produced by his vehicle, and the area of impact.  He then placed each within the 3-D grid.[99]  On cross-examination, Peck acknowledged that he had not relied on Officer Canaria's measurements of the length of the Ranger's yaw mark.  Instead, he relied on photogrammetry analysis of the two photographs

---

[96]May 6 Afternoon RT at 436:10-19.

[97]May 6 Morning RT at 383:21-388:22.

[98]*Id.* at 388:23-392:24.

[99]*Id.* at 396:11-405:13.

taken at the accident scene to determine the location of the yaw mark; this was a measurement that Canaria had not made. Peck explained that the location, as opposed to the length, of the yaw mark was critical to the post-collision analysis and his ability to ascertain the speeds of the two vehicles.[100] Peck also noted that he did not use Officer Canaria's reported POI in creating his simulation; instead, he allowed the simulation program to locate the area of impact and used Officer Canaria's measurements to validate his findings.[101]

50.    After creating a 3-D environment and placing the final resting place of Cantu's vehicle, the yaw mark, and the area of impact in the environment, Peck used a computer simulation program called Simon[102] to recreate the accident. Based on the data that Peck input into Simon and the 3-D environment,[103] the program tests various iterations of each vehicle's speed until the results of the simulation match the physical evidence placed in the physical environment. Here, for example, Peck input different speeds for both Cantu's and Teruya's vehicles until the yaw mark and POR produced by the simulation matched the yaw mark and POR measured by Officer Canaria.[104] On cross-examination, Peck conceded that his simulation did not take into account Teruya's report that Cantu swerved in an attempt to avoid his car immediately prior to the accident. Peck likewise did not take into account Teruya's testimony that he attempted to brake prior to the collision. He said that although Teruya believed he had been able to touch the

---

[100]May 6 Afternoon RT at 456:2-459:2.

[101]*Id.* at 444:2-445:6.

[102]Simon is a physics engine within a physics suite called Human Vehicle Environment ("HVE"). It analyzes a vehicle's response to the environment, a driver's inputs, and any inter-vehicle collision. It is commonly used by accident reconstructionists. (*Id.* at 404:1-22.)

[103]On cross-examination, Peck conceded that Simon requires that the user input values for multiple variables prior to starting a simulation. (*Id.* at 446:17-448:22.) He stated that a user could manipulate such factors as the vehicle's location on a road, steering input and speed, and the vehicle's weight, height, length, and center of mass. (*Id.*) Peck explained, however, that a majority of these variables are automatically supplied by the technical data contained in Simon's database and thus are not manipulated by the user. (*Id.* at 465:6-22.)

[104]May 6 Morning RT at 396:11-405:13. See also May 6 Afternoon RT at 413:13-414:22; Exh. 285.

brakes prior to impact, based on the time that Teruya had to respond, Peck found it unlikely that Teruya actually applied the brakes prior to the collision.[105]

51.   Based on the simulation, Peck concluded that Cantu was traveling 32 miles per hour at the time of the collision and that Teruya was traveling 21 miles per hour.  Peck opined that Cantu could not have come to a full stop or even a rolling stop at the stop line.  He explained that based on published data for a Ford Ranger, it would have been impossible for the vehicle to reach a speed of 32 miles per hour in the 49.5 feet between the stop line and the POI if the vehicle had slowed or stopped at the stop line.  Peck testified that Cantu was traveling at least 22 miles per hour when he crossed the stop line; this calculation reflects the speed at which Cantu would have had to have been traveling if he began maximum acceleration when crossing the stop line.  Because Peck's analysis was based on published data for a V6 Ford Ranger, which has a more powerful engine than the V4 Ranger Cantu was driving, Peck opined that Cantu was likely traveling at a higher rate of speed than 22 miles per hour when he crossed the stop line.[106]

52.   Peck testified that, in addition to the simulation, he also performed an independent analysis of Cantu's post-impact speed.  Peck's analysis took into account the distance the Ranger traveled from the POI to its POR and the published deceleration rate for the Ford Ranger.  Based on the published deceleration rate, Peck was able to determine how fast Cantu's vehicle must have been going at the time of impact for it to slow to a speed of zero while traveling the distance between the POI and the POR.  He testified that his calculations validated the simulation's conclusions regarding Cantu's speed at the time of the collision.[107]

53.   Based on his calculations, Peck opined that Teruya had no opportunity to avoid the collision with Cantu.  He estimated that Teruya's first opportunity to see Cantu was approximately 1.5 seconds prior to impact and that it would have taken an average driver in Teruya's position approximately 2.1 seconds to react.  He testified that he estimated Teruya's perception response

---

[105]May 6 Afternoon RT at 440:3-441:11,463:17-464:20.

[106]May 6 Afternoon RT at 415:19-427:20.

[107]*Id.* at 421:16-424:2.

time ("PRT") based on an algorithm included in the Integrated Driver Response Research ("IDRR") program.  The IDRR program incorporates decades of empirical, real-life research regarding drivers and their response times to various hazards and is widely accepted in the accident reconstruction community.  Peck said he believed that the use of a blanket PRT of 1.5 seconds – such as was used by Brignola in his analysis – was overly simplistic and inappropriate under the circumstances because PRT is a discipline that is very dependent on the specific environment and hazard presented to a particular driver.  He stated that, after he input a number of variables, such as the fact that Cantu's vehicle was at an intersection and appeared from Teruya's side, the IDRR calculated that an average driver – i.e., the 50th percentile – would have needed 2.1 seconds to respond to the hazard.  Peck testified that although there was a range of response times for any given set of circumstances – i.e., that some individuals would respond more quickly than the average response time while others would react more slowly – it was appropriate to assume that Teruya had an average response time.[108]

54.   Peck stated that he had not calculated the speed at which either Cantu or Teruya would have had to be traveling to avoid the collision.[109]

**c.   Conclusion Regarding the Parties' Accident Reconstruction Experts**

55.   The experts agree that both Cantu and Teruya were traveling in excess of the Terminal speed limit at the time of the collision, and that Cantu was traveling faster than Teruya.[110]  Their testimony and conclusions differ in several critical respects, however.  Specifically, Brignola and Peck do not agree as to the actual speed of the two vehicles.  Nor do they agree as to the amount of time Teruya had to react when Cantu's truck first became visible in the intersection.

56.   With respect to the parties' speed and the circumstances surrounding the collision, Brignola's testimony concerning the underlying assumptions on which his opinions were based was vague and, at times, appeared to be contradictory.  On direct examination, Brignola testified that he had

---

[108]*Id.* at 420:6-24, 428:3-433:20.

[109]*Id.* at 445:7-446:16, 448:23-450:3, 455:12-456:1.

[110]See May 5 Morning RT at 118:7-121:23; May 6 Afternoon RT at 415:19-427:20.

concluded Cantu was traveling between 24 and 27 miles per hour at the time of the collision, and that this conclusion was based on his belief that Cantu did not stop at the stop line, but rather "performed a rolling stop or a California stop."[111]   On cross examination, government counsel offered Brignola's deposition testimony as impeachment; during the deposition, Brignola had stated that all of the opinions in his report, including his estimation of Cantu's speed, were based on the assumption that Cantu had stopped at the stop line prior to entering the intersection.[112] After this testimony was read, Brignola stated that his deposition response "referr[ed] to [his] report, not any and all of [his] conclusions in the case."[113]   When counsel asked whether Brignola had reached conclusions not in his report or not stated at his deposition, Brignola said he had not formed any opinions beyond those to which he testified at his deposition.[114]   Brignola admitted that if his assumption that Cantu stopped at the stop line was incorrect, all of his conclusions concerning Cantu, including the speed at which the Ford Ranger had been traveling, were incorrect.[115]   Brignola then stated that his deposition testimony was based on an assumption

---

[111]May 5 Morning RT at 119:17-22.

[112]May 5 Afternoon RT at 140:2-14.

[113]*Id.* at 140:18-20.

[114]*Id.* at 140:21-141:15 ("Q.  Have you reached any conclusion – isn't it true you have not reached any conclusion outside of your report or what you testified to in your deposition.  A: Nothing outside of what I testified to in my deposition, no.  Q. And isn't it true that for the purposes of your deposition as well you assumed that Mr. Cantu stopped at the stop line in reaching any conclusions? A. For my report, yes.  MR. LANE: Motion to strike as nonresponsive.  THE COURT: I didn't understand the answer.  Perhaps you could explain what you meant by that.  THE WITNESS: Sure.  So any assumption in my report was that Mr. Cantu stopped at the stop line.  It's his testimony.  So using that evidence, I drafted my report.  THE COURT: And I'm sorry.  How does that relate to whatever opinions you gave in your deposition?  THE WITNESS: I wrote the report before the deposition.  At [the] time of deposition, I gave all my opinions and they're included here in my deposition").

[115]*Id.* at 141:22-142:22 ("Q. Mr. Brignola, your opinions didn't change from the time you wrote your report until your deposition, did they, as to whether or not Mr. Cantu stopped at the stop line?  A. No.  Q. So your assumption that the Ranger was stopped at the stop line was factored in when you were concluding on Mr. Cantu's possible speeds; correct?  A. Correct.  Q. And your assumption that Mr. Cantu stopped at the stop line, that also factors in to the distance that Mr. Cantu would have been from the area of impact before the accident occurred; correct?  A. Yes.  Q. So if, in fact, your assumption that Mr. Cantu did not stop at the stop line, is it safe to say then that all of your conclusions related to Mr.

19

1    that Cantu had "stopped at the stop line."[116] He next stated, however, that his calculations were

2    not based on this assumption, but rather on "rolling stop information."[117] These contradictions

3    and ambiguities concerning the assumptions on which Brignola's opinion regarding Cantu's

4    speed was based undermine its credibility.

5    57.   Peck's testimony, however, was also not without its shortcomings. His simulation and analysis,

6          for example, did not take into account Teruya's testimony that Cantu had swerved prior to the

7          collision.[118] Nonetheless, the court finds Peck's testimony more credible than that of Brignola.

8          It also finds his simulation reliable. As noted, Peck's simulation relies heavily on

9          photogrammetry to determine the physical location of certain objective evidence at the accident

10         scene – e.g., the location of the yaw mark and the POR of Cantu's truck. As both experts agree,

11         photogrammetry is a method that vehicle accident reconstructionists regularly use in performing

12         their analyses.[119] Peck testified that he was able to perform a photogrammetric analysis because

13         he was given high quality color photographs.[120] This is in contrast to Brignola, who did not use

14         photogrammetry because he was given only low quality black and white photographs of the

15         accident scene.[121]

16   58.   Brignola criticized Peck's photogrammetric analysis, noting that the photogrammetry had a

---

Cantu and the Ranger would be untrue? THE COURT: I think you left out a few words like 'is incorrect.' If his assumption that he stopped at the stop line – MR LANE: I'm sorry. Let me rephrase that. Q. If, in fact, your assumption that Mr. Cantu stopped at the stop line was proven to be untrue, then all of your conclusions related to Mr. Cantu and the Ranger he was driving would also be untrue; correct? A. Yes. Yes, it would").

[116]*Id.* at 145:1-4.

[117]*Id.* at 146:4-9, 149:6-14.

[118]May 6 Afternoon RT at 440:3-441:11.

[119]May 5 Afternoon RT at 135:11-136:4, May 6 Morning RT at 277:23-278:9.

[120]May 6 Morning RT at 284:6-19.

[121]May 5 Afternoon RT at 136:5-19.

residual error of 10.8.[122]  He asserted this was too high to achieve results to a reasonable engineering certainty.[123]  The court does not find Brignola's criticism of Peck's photogrammetric analysis persuasive.  Asked to respond to Brignola's criticism, Peck stated that the referenced value of 10.8 was a residual on a single point used in the analysis and that a residual value of 10 is sufficient to perform a reliable photogrammetric analysis.[124]  Assuming *arguendo* that Brignola's criticism of the residual rate is well-founded, this does not alter the court's conclusion that Peck's analysis is reliable.  Peck testified that he used two photographs and 25-30 reference points from each in his photogrammetric analysis.  He also stated that a minimum of 6 or 7 points per photograph were needed for the analysis to be reliable.[125]  Peck was not impeached on any reference point save the one, and Brignola did not challenge Peck's testimony regarding the minimum number of reference points needed.  Thus, assuming the 10.8 residual value was significant, it is unlikely that it affected the accuracy of Peck's photogrammetic analysis, since there were 49 to 59 other reference points used, and only 12 to 14 reference points were needed for reliable analysis.

59.   The court is similarly not persuaded by Cantu's criticisms of Peck's post-collision analysis.  Cantu asserts that Peck did not consider measurements taken by Officer Canaria and included in his vehicle collision report, i.e., the length of the yaw mark.[126]  Peck plausibly explained his decision not to rely on the length of the yaw mark that Canaria measured, but rather to rely on the photogrammetry analysis to determine the location of the yaw mark, something Canaria did

---

[122]A residual error is the deviation of the observed value from the true (unobservable) value of the item being measured.

[123]*Id.*

[124]May 6 Afternoon RT at 461:25-463:9.

[125]May 6 Morning RT at 388:7-22.

[126]Cantu Brief at 12.

not record.  He stated that, for purposes of a post-collision analysis,[127] the location of the yaw mark, rather than its length, is the most critical factor in analyzing the speeds of the vehicles.[128] Peck's testimony on this point was not controverted at trial.  Moreover, no evidence introduced at trial supported Cantu's argument that it is the length, rather than the *location*, of the yaw mark that is relevant, or that measurement of the length is critical to accurate post-collision analysis. To the extent the length of the yaw mark is significant, moreover, Peck testified that the length resulting from his post-collision analysis matched the length recorded by Canaria.[129]  The same is true of the POI – although Peck did not rely on Canaria's measurements concerning the POI, his post-collision analysis matched those measurements.  This provides additional validation of Peck's analysis and conclusions.[130]  Finally, although Peck conceded on cross-examination that he did not consider Teruya's testimony that he applied his brakes prior to the collision,[131] he explained that he understood Teruya had stated that he attempted to brake at the moment of the collision, which would not have had an effect on the speed of Teruya's vehicle at the point of impact.[132]   The significance of this criticism, moreover, is unclear as Brignola's estimate of Teruya's speed was the same as Peck's.

60. Importantly, as Peck testified at trial, the validity of the conclusions he reached in his post-collision analysis – specifically, the speeds at which Cantu and Teruya were traveling at the moment of the collision – were validated by independent calculations that in turn were based on published information concerning the deceleration rate for Cantu's vehicle.[133]

---

[127]Another common analysis that is regularly used by accident reconstructionists, but was not performed by Brignola in this case.

[128]May 6 Afternoon RT at 456:2-459:2.

[129]*Id.* at 444:2-445:6.  See Exh. 285.

[130]See *Id.*

[131]*Id.* at 463:17-464:20.

[132]*Id.*

[133]*Id.* at 421:16-424:2.

61.   In sum, Peck's post-collision analysis utilized techniques commonly employed by accident reconstructionists and was independently validated by separate calculations, as well as physical evidence from at the accident scene.  In combination with the fact that Brignola did not utilize many of these techniques or perform a post-collision analysis, and the ambiguity concerning the assumptions that underlie his opinions, the court finds Peck's testimony more credible than Brignola's, and credits Peck's testimony regarding the speeds of the vehicles at the time of impact.  Accordingly, the court concludes that Cantu was traveling at 32 miles an hour and Teruya was traveling at 21 miles an hour at the time of the collision.

62.   As respects Teruya's PRT, Brignola opined that it was appropriate to use a PRT of 1.5 seconds, the response time that was "the published and accepted value" for "the typical driver" that could be "applied to everyone [in] [a]ll situations."[134]  Peck criticized Brignola's reliance on the 1.5 second uniform PRT, asserting that it was "an overly general application" of the uniform PRT.[135] Peck explained that PRT is situational and varies in any given environment, making blanket application of a PRT inappropriate.[136]  He also explained the process by which he calculated Teruya's PRT in this particular situation.[137]

63.   The court finds Peck's testimony concerning PRT more credible than Brignola's and therefore credit's Peck's calculation of Teruya's PRT instead of Brignola's.  Peck has given numerous presentations concerning PRT and published various technical articles on the subject.[138] Brignola, by contrast, performed no PRT analysis, noting that it was "outside the scope of [his] expertise."[139]

---

[134]May 5 Afternoon RT at 133:4-9.

[135]May 6 Afternoon RT at 433:3-18.

[136]*Id.*

[137]*Id.*

[138]May 6 Morning RT at 381:10-24.

[139]May 5 Afternoon RT at 151:16-21.

### D.      Cantu's Injuries and Medical Treatment

#### 1.      Cantu's Treatment History

64.   Following the accident, Cantu was taken to St. Mary's Medical Center in Long Beach, California, for examination.  He was released from St. Mary's several hours after arriving.[140]

65.   The following day, Cantu saw his primary care physician, Dr. Taus.[141]

66.   Some time thereafter, Cantu's attorney referred him to Dr. James Loddengaard, M.D., for evaluation.[142]  Dr. Loddengaard is a board-certified orthopedic surgeon practicing in Torrance, California.  He graduated from California Technical Institute in 1974 and from the University of California, Los Angeles Medical School in 1978.  After graduating from UCLA, Dr. Loddengaard did his residency in orthopedic surgery at Harbor UCLA Medical Center. Following his residency, Dr. Loddengaard took his orthopedic boards, and was board-certified in orthopedic surgery in 1985.  He maintains a clinical practice and is also a medicolegal consultant.[143]

67.   Dr. Loddengaard first examined Cantu on April 20, 2011 – two days after the accident.  At that time, Cantu told Dr. Loddengaard that he had been in an accident at the Terminal in which his car flipped over.  Cantu said that he had immediate pain in his left shoulder, his neck, and his back, and that the pain had steadily gotten worse.  Dr. Loddengaard examined Cantu and diagnosed sprain-strain injuries of the neck and upper and lower back, as well as an injury to Cantu's acromioclavicular ("AC") joint in his left shoulder – specifically, a Grade I AC separation, which is the least severe of AC separations.  In his initial examination, Dr. Loddengaard also noted that there was no crepitus, i.e., snapping and/or grinding, of the

---

[140]May 5 Morning RT at 58:24-59:4.

[141]*Id.* at 100:2-10.

[142]*Id.*

[143]*Id.* at 156:6-157:9.

shoulder; he did, however, observe a popping in the AC joint with motion.[144]  Dr. Loddengaard concluded that Cantu's prognosis was "good," as his neck and back injuries appeared to be largely soft tissue and his shoulder, while tender at the AC joint, was not displaced.  Dr. Loddengaard prescribed Vicodin and ibuprofen for Cantu's pain and Flexeril, a muscle relaxant. He also instructed Cantu to go to physical therapy.[145]

68.   Dr. Loddengaard next evaluated Cantu on May 4, 2015.  At that time, Cantu reported that his lower back pain had improved, but that his neck was still stiff and his left shoulder constantly ached; the aching was aggravated by lifting and movement.  Cantu also said he had tried exercises for the left shoulder at physical therapy, but stopped because they bothered him.  Dr. Loddengaard performed a shoulder examination and Cantu reported that stretching or rotating the left shoulder was painful.  Dr. Loddengaard continued to prescribe Vicodin, ibuprofen, and Flexeril; he instructed Cantu to continue physical therapy.[146]

69.   Two weeks later, Cantu went to Dr. Loddengaard for another follow-up examination. Cantu told the doctor he no longer had lower back pain; he said, however, that his neck was still sore and that physical therapy helped only slightly.  Cantu also reported that he continued to have aching shoulder pain that was only slightly better.  Dr. Loddengaard continued Cantu on the pain relievers and muscle relaxant he had earlier prescribed and instructed him to continue physical therapy, with particular focus on his left shoulder.[147]

70.   Cantu was next evaluated on June 14, 2011.  At that time, Cantu reported that he had mild neck pain, that the pain in his upper back was mild to moderate, and that his left shoulder felt worse and popped a lot.  Dr. Loddengaard observed that Cantu continued to have popping in his AC

---

[144]May 5 Afternoon RT at 158:9-162:25, 194:2-197:25; Exh. 263.  Loddengaard testified that although popping of the AC joint can signify a meniscus tear, he did not diagnose Cantu with a torn meniscus when he first saw him on April 20.  (*Id.* at 165:19-24, 196:11-20.)

[145]*Id.* See also May 5 Afternoon RT at 159:7-12.

[146]Exh. 264.  See also May 5 Afternoon RT at 161:7-163:5.

[147]Exh. 265.  See May 5 Afternoon RT at 163:8-164:7.

25

joint and that he had pain in his shoulder on resisted external rotation. Dr. Loddengaard prescribed Vicodin Extra Strength and ordered an MRI based on findings concerning the AC joint. He directed Cantu to continue physical therapy and increase his activity level.[148]

71.   On July 1, 2011, Dr. Loddengaard reviewed the results of the MRI with Cantu. He stated that the MRI revealed Cantu's rotator cuff was not torn. Based on Cantu's reports of continued pain, however, as well as positive findings during a shoulder evaluation, Dr. Loddengaard noted that it might be necessary to give Cantu Cortisone injections in the left shoulder.[149]

72.   Eighteen days later, Cantu returned to Dr. Loddengaard for a checkup. Cantu reported that his neck remained tight despite physical therapy and that his shoulder continued to be very painful. Dr. Loddengaard injected Cortisone in Cantu's subacromial bursa, which is a muscle in his shoulder next to the AC joint. He told Cantu to remain off work and participate in physical therapy.[150]

73.   Cantu was next evaluated on August 2, 2011. He complained of stiffness in his neck and painful snapping in his shoulder. He reported that the Cortisone injection had not alleviated the pain in his shoulder. Dr. Loddengaard concluded it was likely there was torn cartilage in Cantu's AC joint as the Cortisone injection had not helped. Dr. Loddengaard instructed Cantu to continue with physical therapy and noted that he would consider a Cortisone injection in Cantu's AC joint if the pain did not subside.[151]

74.   On September 1, 2011, Dr. Loddengaard saw Cantu again. He noted that stiffness in Cantu's neck remained the "main problem" and that Cantu also complained of popping and numbness in his left shoulder. Dr. Loddengaard gave Cantu a Cortisone injection in his AC joint. He told

---

[148]Exh 266. See May 5 Afternoon RT at 164:14-165:17.

[149]Exh. 267. See May 5 Afternoon RT at 166:2-24.

[150]Exh. 268. See May 5 Afternoon RT at 167:1-168:5.

[151]Exh. 269. See also May 5 Afternoon RT at 168:10-170:6.

Cantu to continue with physical therapy and engage in such activity as he could tolerate.[152]

75. Dr. Loddengaard examined Cantu on September 23, 2011, to evaluate his response to the Cortisone shot. Cantu reported that his neck was still stiff and that he could not look up. He said that the Cortisone injection had appeared at first to help his left shoulder a lot and that he had begun to exercise it more as a result. He stated that the pain had returned a day earlier, however, and that it persisted at the time of the evaluation.[153] Dr. Loddengaard testified that based on Cantu's statements that the Cortisone shot had helped, he concluded that Cantu's pain likely emanated from his AC joint. In Dr. Loddengaard's experience, Cortisone shots are only a temporary solution for a damaged AC joint. Consequently, he began to discuss surgery options with Cantu.[154] Dr. Loddengaard continued to prescribe Vicodin Extra Strength and instructed him to return for a checkup in three weeks and remain off work in the interim.[155]

76. When Cantu returned for a checkup on October 24, 2011, he reported that his neck remained the primary problem. He said that his neck was stiff and hurt frequently and, he did not believe he was ready to return to work as a result. Cantu also told Dr. Loddengaard that his left shoulder bothered him when he reached overhead, but did not hurt when it was at rest. Dr. Loddengaard injected Cantu's AC joint and told him to continue physical therapy for the left shoulder. He also spoke more with Cantu about surgery to repair his AC joint.[156]

77. Dr. Loddengaard evaluated Cantu again approximately one month later, on November 21, 2011. Cantu again complained of tightness in his neck and pain in his shoulder. He also said he was beginning to consider shoulder surgery. Dr. Loddengaard evaluated Cantu's range of motion and noted several positive findings – i.e., issues related to Cantu's range of motion – on testing his AC joint. He told Cantu to continue physical therapy in order to strengthen his AC joint. In

---

[152]Exh. 270. See also May 5 Afternoon RT at 170:9-171:1.

[153]Exh. 271.

[154]May 5 Afternoon RT at 171:11-172:5.

[155]*Id.*

[156]Exh. 272. See May 5 Afternoon RT at 173:3-23.

the event his shoulder did not improve, Dr. Loddengaard advised that surgery would be required.[157]

78.    On December 21, 2011, Dr. Loddengaard examined Cantu. Cantu complained that his shoulder had gotten worse. According to Dr. Loddengaard, this was attributable to the fact that the shot into his AC joint had worn off. Dr. Loddengaard recommended that Cantu undergo surgery on his left shoulder; specifically, he proposed an anthroscopy, subacromial decompression and distal clavicle resection.[158]

79.    Cantu returned to Dr. Loddengaard's office on February 1, 2012, with complaints of stiffness in the neck and shoulder pain. Dr. Loddengaard testified that while he had recommended surgery, Cantu did not authorize a surgical procedure because he had exhausted his workers' compensation benefits and was having trouble paying for other necessities.[159]

80.    Dr. Loddengaard saw Cantu again on February 23, 2011. He evaluated Cantu's neck and left shoulder joint given his reports of continuing pain and discomfort. Dr. Loddengaard found that Cantu's AC joint continued to pop when in motion and that he had pain with resisted external rotation. He continued Cantu's current medications and requested that he return for a checkup in one month. Dr. Loddengaard testified that Cantu did not agree to AC surgery at that time because his state disability benefits had ended and he did not have the financial means to afford surgery.[160]

81.    On October 9, 2012, Dr. Loddengaard issued a final report concerning Cantu. Cantu reported that he continued to have on and off back pain. He also told Dr. Loddengaard that his neck continued to be stiff; he did not complain of persistent pain in his neck, however. Finally, Cantu reported that his left shoulder continued to be painful and that he could not perform lashing jobs that he had previously been able to perform. Nor could he work on trains because the work

[157]Exh. 273. See May 5 Afternoon RT at 174:4-22.

[158]Exh. 274. See May 5 Afternoon RT at 175:1-24.

[159]Exh. 275. See May 5 Afternoon RT at 176:2-177:3.

[160]Exh. 276. See May 5 Afternoon RT at 177:6-178:13.

bothered his shoulder.[161]  Dr. Loddengaard concluded that Cantu exhibited signs of injury to his neck, back, and left shoulder and stated that he required surgery on his left shoulder.  He testified that the recommended surgery is often successful, but that it would require that Cantu remain out of work for four months after the surgical procedure.  He did not impose specific restrictions on Cantu's return to work, but stated that he was limited in his ability to work at or above shoulder level.[162]

### 2.    The Government's Medical Witnesses

#### a.    Dr. Geoffrey Miller

82.  The government called Dr. Geoffrey Miller, a board-certified orthopedic surgeon, as a non-retained expert witness.  He received his bachelor's degree from the University of Texas and, in 1976, graduated from the University of Texas School of Medicine.  Thereafter, he was a resident at Columbia University Medical Center; from 1981 to 1982, he had a fellowship at Rancho Los Amigos Hospital in California.  He is currently an associate clinical professor at the University of Southern California ("USC") where he spends the majority of his time training residents.  He is also actively involved in the American Fracture Association, American Academy of Orthopedic Surgeons – California Medical, the Medical Board of California, and the American Board of Orthopedic Surgery.[163]

83.  Dr. Miller maintains a clinical practice, treating primarily workers' compensation patients and work injuries.  As part of his clinical practice, Dr. Miller regularly evaluates patients suffering from soft tissue injuries and injuries to various joints, including the shoulder.  He also performs orthopedic surgery on a regular basis.  In addition to treating patients, Dr. Miller has also served as an expert witness in orthopedic surgery on multiple occasions.  Dr. Miller estimates that he serves 70 to 80 percent of his current patients as a treating physician and that he performs one-

---

[161]Exh. 277.  See May 5 Afternoon RT at 179:3-23.

[162]May 5 Afternoon RT at 179:24-182:4.

[163]May 6 Morning RT at 309:18-314:6.

1    time evaluations of patients the remaining 20 to 30 percent of his time.[164]

2    84.  Dr. Miller is qualified to testify as a non-retained expert regarding his examination of Cantu in

3    2011.[165]

4    85.  Dr. Miller examined Cantu a single time on August 17, 2011, at the request of Homeport

5    Insurance Company ("Homeport"), the worker's compensation carrier for Cantu's employer.

6    Before physically examining Cantu, Dr. Miller reviewed, *inter alia*, Officer Canaria's vehicle

7    collision report, the SSA injury report, Dr. Loddengaard's treatment notes, reports of the MRI

8    and scans and X-rays Dr. Loddengaard had ordered for Cantu, and physical therapy notes from

9    Back in Motion Physical Therapy – the physical therapy office to which Dr. Loddengaard

10   referred Cantu.[166]

11   86.  Dr. Miller made no positive, objective physical findings that revealed Cantu had ongoing

12   damage to his shoulder or AC joint.  Comparing Cantu's left shoulder to his right, Dr. Miller

13   observed no discernable difference in range of motion between the two.  He also noted an

14   absence of atrophy, swelling, deformity, and asymmetry in Cantu's left shoulder.  Dr. Miller

15   observed the "clicking" sound in Cantu's left shoulder that Dr. Loddengaard had noted in his

16   care of Cantu.  Dr. Miller stated, however, that the clicking was incidental and of "no clinical

17   significan[ce]," because he observed the same clicking sound in Cantu's right shoulder, which

18   was in good health, and because the presence of clicking often represents nothing more than a

19   tendon rubbing.[167]

20   87.  Dr. Miller testified that Cantu had subjective complaints of pain in his left shoulder when he

21   held his arm at 90 degrees.  He stated, however, that he asked Cantu to show him how far he

22   could raise his arm without pain, and that, in response, Cantu held his arm at 90 degrees.  It was

24   [164]*Id.* at 314:16-318:24.

25   [165]See *id.* at 319:24-320:2.  See also Order Denying Plaintiff's Motion *in Limine*, Docket No. 47
26   (Apr. 6, 2015).

27   [166]*Id.* at 320:8-322:2.

28   [167]*Id.* at 325:9-327:23.

30

only above that level, i.e., greater than 90 degrees, that Cantu reported pain.  Dr. Miller explained he was suspicious of Cantu's report of pain when holding his arm above 90 degrees given that Cantu could hold his arm at 90 degrees without pain.  Because the shoulder muscles and rotator cuff are maximally contracted at 90 degrees, Dr. Miller could not identify any physiological reason why it would be painful for Cantu to lift his arm beyond that level given that the muscles would not contract further.[168]  Dr. Miller testified that when he stressed the AC joint, he found no symptoms indicative of a continuing injury in the shoulder.  He noted that the area about which Cantu complained and which he identified as the source of pain was in the back of and at the front of his shoulder, as well as near the neck; by contrast, the AC joint is on the top of the shoulder.[169]

88. Based on his evaluation of Cantu's medical records and the physical examination he conducted on August 17, 2011, Dr. Miller concluded that Cantu sustained straining, or "stretching-type," injuries resulting from the car accident in April 2011 and that as of August 2011, there were no objective findings of continuing injuries resulting from the car accident.  Dr. Miller's findings upon conducting a physical examination were particularly significant in forming this opinion – i.e., that the range of motion in Cantu's two shoulders was the same, that the popping sound noted by Dr. Loddengaard was present in each of Cantu's shoulders, and that there was no atrophy, redness, or swelling around the AC joint.  Dr. Miller noted physical therapy records stating that the condition of Cantu's shoulder had not changed since May 2011, and Cantu's statement that the condition of his shoulder had remained the same since that time.  He concluded that, as of the date of the examination, Cantu could return to work and was in no need of further medical treatment of his shoulder.  This included the surgery Dr. Loddengaard had recommended.[170]

---

[168]*Id.* at 327:19-330:17.

[169]*Id.* at 330:18-331:22.

[170]*Id.* at 331:23-335:13.

### b.    Dr. Jacob Tauber

89.    The government also called Dr. Jacob Tauber as a retained expert.  Dr. Tauber is a board-certified orthopedic surgeon.  He graduated *Phi Beta Kappa* and *magna cum laude* with a bachelor's degree from the University of Pennsylvania in 1972.  Thereafter, Dr. Tauber attended medical school at Yale and graduated with his doctorate in 1976.  He received his general surgical training at Cornell New York Hospital and was an orthopedic surgery resident at Yale until 1980.[171]

90.    Dr. Tauber is qualified to give relevant expert medical testimony in this case.[172]

91.    Dr. Tauber has a clinical practice, regularly treating patients with on-the-job orthopedic and soft-tissue injuries.  He also serves as a Qualified Medical Evaluator ("QME") and Agreed Medical Examiner ("AME") for the California worker's compensation system.  In that capacity, he regularly assesses patients who have suffered a workplace injury to determine whether they are fit to return to work and whether or not they can perform their normal duties.[173]

92.    In addition to his clinical practice, Dr. Tauber provides medicolegal testimony as a retained expert.  He testifies equally for plaintiffs and defendants.  He has previously testified as a retained expert against the government.[174]

93.    Prior to performing a physical evaluation of Cantu, Dr. Tauber reviewed his medical records and radiologic reports dating back to 2000; medical records and notes from Dr. Taus, Cantu's primary care physician; emergency room records from St. Mary's Medical Center; Officer Canaria's traffic collision report; Dr. Loddengaard's treatment records; Dr. Miller's report; and an MRI of both of Cantu's shoulders.[175]  He also reviewed various documents related to the litigation, including Cantu's complaint, the government's answer, discovery responses, and

---

[171]May 6 Morning RT at 351:6-24.

[172]*Id.* at 351:21-24.

[173]*Id.* at 352:5-355:2.

[174]*Id.* at 355:4-8.

[175]*Id.* at 356:1-7.

various liens filed by insurance companies.[176]

94.   Dr. Tauber physically examined Cantu on January 13, 2015.  Cantu presented with complaints of ongoing neck pain, as well as pain and popping in his left shoulder.  Cantu told Dr. Tauber that he had numbness and tingling in his left ring and small fingers.  Dr. Tauber stated that Cantu also said he had been working for approximately two years since being off work for one year following the accident; he reported that he took one or more Motrin a day to address his pain.[177]

95.   Dr. Tauber testified that during the physical examination, he observed that Cantu had full range of motion in his neck, notwithstanding Cantu's complaint of tightness.  He performed a neurological exam, and concluded that Cantu's complaint of numbness and tingling in his ring and small fingers was attributable to Tinel's syndrome, i.e., a pinched or irritated nerve ending in the elbow.  He explained that Tinel's syndrome resulted from repetitive motion and most likely arose at work; he concluded that it was unrelated to the April 2011 accident because Dr. Loddengaard and Dr. Miller had not made positive findings of Tinel's syndrome during their evaluations and treatment in preceding years.[178]

96.   As respects Cantu's left shoulder, Dr. Tauber noted that his range of motion was normal and that there were no objective indications of impingement, contrary to Dr. Loddengaard's findings.  Nor were there any other objective findings from the exam or the MRI included in Cantu's medical records.[179]

97.   Based on Dr. Tauber's review of Cantu's medical records – including Dr. Loddengaard's treatment records and the physical therapy notes – and his physical examination of Cantu, Dr. Tauber concluded that, as a result of the April 2011 accident, Cantu suffered soft tissue sprains of his spine and shoulder girdle.  He opined that Dr. Loddengaard's treatment and prescribed physical therapy was reasonably and medically necessary for a period of four months after the

---

[176]*Id.* at 356:8-13.

[177]*Id.* at 357:13-358:14.

[178]*Id.* at 358:14-361:23.

[179]*Id.* at 361:23-367:6.

accident. He further opined that Dr. Loddengaard's treatment was not medically necessary after the first four months given the lack of objective findings in Cantu's medical records. Dr. Tauber stated that it would be speculative to conclude that Cantu required surgery given that there had never been an objective finding of pathology.[180]

### E.   Damages

98.   Homeport Insurance Company, the worker's compensation insurer for Cantu's employer, has asserted a medical lien for $6,686.43. The lien covers medical treatment provided to Cantu from the time of the accident to October 9, 2012.[181]

99.   Dr. Loddengaard testified that all medical treatment provided was reasonable and medically necessary, and that the cost of the treatment was also reasonable.[182] Drs. Miller and Tauber do not dispute the cost of the medical treatment, nor do they dispute that the treatment provided until August 17, 2011, was medically necessary and appropriate.

100.   Colony Ramsey, a representative of Homeport Insurance, testified at trial. She stated that all records supporting the Homeport Lien were kept in the course of regularly conducted business activities and were made at the time of the payments.[183] Ramsey testified that although she was not the adjustor who ordered the medical treatment and thus did not have personal knowledge as to whether the treatment was actually ordered by the providers and was medically necessary, Homeport adjustors with personal knowledge of the treatments investigated whether each treatment was prescribed by a doctor and whether it was reasonably necessary.[184]

101.   The International Longshore and Warehouse Union-Pacific Maritime Association ("ILWU-PMA") also has a medical lien in the amount of $19,787.56. This lien reflects medical treatment

---

[180]*Id.* at 367:7-370:6.

[181]May 6 Afternoon RT at 469:25-470:3. See also Exh. 260.

[182]May 5 Afternoon RT at 183:3-186:16.

[183]May 6 Afternoon RT at 467:19-470:3.

[184]*Id.* at 471:12-472:12.

1   for Cantu on or after August 30, 2011.[185]

2   102.   ILWU-PMA's lien ledger contains redacted items that were not medically necessary or incurred

3   in connection with the accident.  Jeff Rhodes, who testified for the ILWU-PMA Benefit Plan at

4   trial, did not make the redactions, nor did he personally review the invoices to determine

5   whether treatment had been rendered as reflected or whether it was authorized by Cantu's

6   medical doctors.  Rhodes testified, however, that ILWU-PMA adjustors reviewed all expenses

7   reflected to determine that they were ordered by medical providers and were reasonable.[186]

8   102.   Cantu earned $44,284.46 in 2006.[187]

9   103.   Cantu earned $67,466.95 in 2007.[188]

10   104.   Cantu earned $61,935.46 in 2008.[189]

11   105.   Cantu earned $60,543.36 in 2009.[190]

12   106.   Cantu earned $89,065.58 in 2010.[191]

13   107.   Cantu earned $27,554.14 in the first quarter of 2011, immediately prior to the accident in April

14   2011.[192]

15   108.   Cantu earned gross wages of $95,977.08 in the four quarters immediately preceding the accident

16   in April 2011.[193]

17   109.   Any conclusion of law that is deemed a finding of fact is incorporated herein as such.

18

_____

19   [185]May 5 Afternoon RT at 209:14-20, 210:12-13, 214:23-215:1.  See also Exh. 257.

20   [186]May 5 Afternoon RT at 203:14-215:1, 223:8-224:4.

21
22   [187]Exh. 253 at USA00792-801.

23   [188]*Id.* at USA00801-811.

24   [189]*Id.* at USA00811-821.

25   [190]*Id.* at USA00821-831.

26   [191]*Id.* at USA00831-841.

27   [192]*Id.* at USA00941.

28   [193]*Id.* at USA00936-941.

## II. CONCLUSIONS OF LAW

### A.   Legal Standard Under the Federal Tort Claims Act

1.   The government was substituted as defendant in place of Officer Teruya under 28 U.S.C. § 2679(d)(1), because Teruya was an employee of the United States Department of Homeland Security, Customs and Border Protection at all relevant times.   The Federal Tort Claims Act ("FTCA") thus provides Cantu's exclusive remedy.   See 28 U.S.C. § 2679(b)(1).   Under the FTCA, "district courts . . . have exclusive jurisdiction of civil actions or claims against the United States . . . for . . . personal injury . . . caused by the negligent or wrongful act or omission of any employee of the Government while acting in the scope of his office or employment."   28 U.S.C. § 1346(b)(1).

2.   Because Cantu's claims arose in California, liability under the FTCA is determined by reference to California law.   See *Aramyan v. United States*, No. CV 08-00360 MMM (CWx), 2010 WL 532536, *17 (C.D. Cal. Feb. 8, 2010) (citing *United States v. English*, 521 F.2d 63, 65 (9th Cir. 1975)).

### B.   Legal Standard Governing Liability for Negligence Under California Law

3.   To prove a negligence claim under California law, a plaintiff must show: "(a) a legal duty to use due care, (b) a breach of that duty, and (c) that the breach was the proximate or legal cause of the injury."   *Sedie v. United States*, No. C-08-04417 EDL, 2010 WL 1644252, *11 (N.D. Cal. Apr. 21, 2010) (citing *Ting v. United States*, 927 F.2d 1504, 1513 (9th Cir. 1991) (in turn citing *United States Liability Ins. Co. v. Haidiner -Hayes, Inc.*, 1 Cal.3d 586, 594 (1970)); *Peter W. v. San Francisco Unified School District*, 60 Cal.App.3d 814, 820 (1976) ("According to the familiar California formula, the allegations requisite to a cause of action for negligence are (1) facts showing a duty of care in the defendant, (2) negligence constituting a breach of the duty, and (3) injury to the plaintiff as a proximate result").

4.   Under California law, a plaintiff's contributory negligence no longer precludes recovery. See *Li v. Yellow Cab Co.*, 13 Cal.3d 804, 813 (1975) (replacing California's "all-or-nothing" contributory negligence system with a comparative fault system "under which liability for damage will be borne by those whose negligence caused it in direct proportion to their respective

fault"). "Under the principles of comparative fault, a person's negligent conduct may be assigned a share of fault greater than zero percent only when the conduct was a substantial factor in the causation of the pertinent injuries." *Hernandez v. County of Los Angeles*, 226 Cal.App.4th 1599, 1614 (2014) (citing *Chakalis v. Elevator Solutions, Inc.*, 205 Cal.App.4th 1557, 1572-73 (2012); *Stewart v. Union Carbide Corp.*, 190 Cal.App.4th 23, 33 (2010)). Stated differently, comparative fault refers to "conduct on the part of the plaintiff which falls below the standard to which he should conform for his own protection, and is a legally contributing cause [cooperating] with the negligence of the defendant in bringing about the plaintiff's harm." *United States v. Sierra Pacific Industries*, 879 F.Supp.2d 1128, 1134 (E.D. Cal. 2012) (citing *Gyerman v. U.S. Lines Co.*, 7 Cal.3d 488, 500 (1972); RESTATEMENT (SECOND) OF TORTS § 463). "Under comparative fault, 'liability for damage will be borne by those whose negligence caused it in direct proportion to their respective fault.'" *Willis v. City of Fresno*, No. 1:09-CV-01766-BAM, 2014 WL 1419239, *12 (E.D. Cal. Apr. 14, 2014) (citing *Bourland v. City of Redding*, No. 2:09-cv-03195-KJM-CMK, 2013 WL 4653195, *4 (E.D. Cal. Aug. 29, 2013); *Aidan Ming-Ho Leung v. Verdugo Hills Hospital*, 55 Cal.4th 291, 303 (2012)). "Generally, a defendant has the burden of establishing that some nonzero percentage of fault is properly attributed to the plaintiff." *Pfeifer v. John Crane, Inc.*, 220 Cal.App.4th 1270, 1285 (2013) (citing *Sparks v. Owens-Illinois, Inc.*, 32 Cal.App.4th 461, 476 (1995)).

## C.   Whether Officer Teruya Was Negligent in the Operation of His Vehicle

### 1.   Duty

5.   "A driver must exercise the degree of care and caution that an ordinarily careful and prudent person, acting in same or similar circumstances, would exercise." *Sedie*, 2010 WL 1644252 at *11 (citing *Sills v. Forbes*, 33 Cal.App.2d 219, 227 (1939)). "[A driver is] under a duty, both by statute and common law, to operate his vehicle without negligence so as to abstain from injuring any other person or his property." *Bewley v. Riggs*, 262 Cal.App.2d 188, 194 (1968). This duty is imposed on a driver whether he is traveling on a public or private roadway. See, e.g., *Dayton v. Landon*, 192 Cal.App.2d 739, 745 (1961) ("'[T]he driver of a vehicle, either on a public highway or a private driveway [has a duty] to other persons under the general rule

requiring every person to so conduct himself and so to use his property that injury will not result to others – *sic utere tuo ut alienum non laedas* – thus rendering him liable for his wrongful acts whether willfully or carelessly done. This rule and maxim are embraced and defined in section 1714 of our Civil Code, which provides: 'Every one is responsible, not only for the result of his willful acts, but also for an injury occasioned to another by his want of ordinary care or skill in the management of his property or person,'" citing *Altomare by Altomare v. Hunt*, 101 Cal.App.2d 10, 12-14 (1950); *Withey v. Hammond Labor Co.*, 140 Cal.App. 587, 604 (1934)).

6.   The parties do not dispute that, as the driver of the 2008 CBP Ford Explorer, Teruya had a duty to operate his vehicle in a non-negligent manner. See, e.g., *Sedie*, 2010 WL 1644252 at *11 ("As the driver of the postal truck, Mr. Rafael was under a duty to operate his vehicle without negligence").

### 2.   Breach of Duty

7.   Cantu argues that Teruya breached this duty by traveling faster than the designated speed limit in the Terminal; and by looking down and to the side rather than ahead as he proceeded south on Breakway 100.[194]

8.   The court has already found that Teruya was driving 21 miles per hour at the time of the accident; it logically follows that he was traveling at least that fast prior to the accident. As a result, Teruya was traveling at least six miles per hour above the Terminal's speed limit.

9.   The government argues that Teruya was not traveling at an excessive speed because California's *prima facie* speed limit of 25 miles per hour applied at the Terminal.[195] California Vehicle Code § 22352 states that, in the absence of contrary signs, the *prima facie* speed limit "[o]n any highway other than a state highway, in any business or residence district unless a different speed is determined by local authority under procedures set forth in this code" is 25 miles per hour. See CAL. VEH. CODE § 22352(b)(1). The court does not agree that California's *prima facie* speed limit applied at the Terminal.

---

[194]Cantu Brief at 4-6, 7-8.

[195]Government Brief at 5-7.

10. First, the government cites no authority supporting its assertion that the California Vehicle Code applies to private roadways, such as Breakway 100 and Row S-200, and in fact, the opposite appears to be true.  As the California Supreme Court has recognized, "[t]he distinction between a public and a private road is frequently the crux of a decision.  'It has been generally held in civil actions involving motor vehicle accidents that statutory traffic regulations or rules of the road have no application to the conduct of traffic on private ways or premises.'"  *O'Donnell v. Mullaney*, 66 Cal.2d 994, 998 (1967) (citing 7 AM. JUR. 2D, AUTOMOBILES AND HIGHWAY TRAFFIC, § 169)).  Rather, the Vehicle Code applies on private roads only where the legislature has explicitly so stated.  *Id.* ("When the Legislature intends to make its motor vehicle laws apply on private property, it does so in clear language").  Here, there is no clear legislative direction.  In fact, the Vehicle Code explicitly limits the applicability of the *prima facie* speed limit to "highways"; the code defines that term as "a way or place of whatever nature, publicly maintained and open to the use of the public for purposes of vehicular travel," which includes streets.  CAL. VEH. CODE § 360.

11. Second, even if the court were to agree that California's *prima facie* speed limit applied on private roadways such as those at the Terminal – which, as noted, it does not – it would not find that the *prima facie* speed limit applied in this case.  As noted, a sign stating that there was a 15 mile per hour speed limit at the Terminal was posted at the in-gate through which all vehicles entering the Terminal were required to pass.  Although the government makes much of the fact that Teruya and Canaria testified that they did not recall seeing posted speed limit signs in the Terminal,[196] Cantu and Wargo offered uncontroverted testimony that a sign stating that there was a 15 mile per hour speed limit was posted at the Terminal entrance for all drivers to see.[197]  When a specific speed limit has been posted, the *prima facie* speed limit does not apply.  See CAL. VEH. CODE § 22352 (noting that the *prima facie* speed limit applies unless another limit is posted).  Thus, even were the court to conclude that the Vehicle Code generally applied inside

---

[196]See May 5 Afternoon RT at 240:20-22, 256:25-257:15.

[197]See May 5 Morning RT at 103:10-13, 105:20-23, 106:13-20.

the Terminal, it would find that § 22352 did not apply because there was a posted speed limit of 15 miles per hour at the Terminal.

12.   Consequently, the court concludes that Teruya was traveling in excess of the posted 15 mile per hour speed limit at the time of the accident.

13.   The fact that Teruya was traveling in excess of the posted speed limit does not establish that he was negligent as a matter of law, however.   Rather, the question is whether traveling over the speed limit was negligent under the circumstances.   See *Williams v. Cole*, 181 Cal.App.2d 70, 74 (1960) ( "The mere driving of an automobile in excess of the speed limit does not show negligence as a matter of law.   The jury is free to find [defendant] not guilty of negligence even if they found that he was exceeding the speed limit," citing *Hardin v. San Jose City Lines, Inc.*, 41 Cal.2d 432, 438-39 (1953); *King v. Ludlow*, 165 Cal.App.2d 620, 625-26 (1958)); JUDICIAL COUNCIL OF CALIFORNIA CIVIL JURY INSTRUCTION 707 ("The speed limit where the accident occurred was [ ] miles per hour.   The speed limit is a factor to consider when you decide whether or not [defendant] was negligent.   A driver is not necessarily negligent because he or she was driving faster than the speed limit.   However, a driver may be negligent even if he or she was driving at or below the speed limit"); see also, e.g., *Varela v. Birdi*, Nos. D064315 & D065631, 2015 WL 877793, *6 (Cal. App. Feb. 27, 2015) (Unpub. Disp.) ("[P]roof of speed in excess of a *prima facie* speed limit in a civil case does not establish negligence as a matter of law and it is necessary to establish as a fact that 'such excess speed' constituted negligence," citing *Hardin v. San Jose City Lines, Inc.*, 41 Cal.2d 432, 438-40 (1953));[198] *Huffman v. Voth*, 90 Cal.App.2d 305, 308 (1949) ("If it be assumed that it discloses a speed in excess of the *prima facie* speed provided for [in the Vehicle Code], it shall not be taken as establishing negligence as a matter of law, and must be considered and passed upon as a matter of fact"); CAL. VEH. CODE § 40831

---

[198]"Although the court is not bound by published decisions of intermediate state courts, unpublished opinions that are supported by reasoned analysis may be treated as persuasive authority." *Scottsdale Ins. Co. v. OU Interests, Inc.*, No. C 05-313 VRW, 2005 WL 2893865, *3 (N.D. Cal. Nov. 2, 2005) (citing *Employers Ins. of Wausau v. Granite State Ins. Co.*, 330 F.3d 1214, 1220 n. 8 (9th Cir. 2003) ("[W]e may consider unpublished state decisions, even though such opinions have no precedential value")).

("In any civil action proof of speed in excess of any *prima facie* limit declared in Section 22352 at a particular time and place does not establish negligence as a matter of law but in all such actions it shall be necessary to establish as a fact that the operation of a vehicle at the excess speed constituted negligence").[199]

14.   The court concludes that Teruya's speed – six miles per hour above the posted speed limit – was unreasonable and negligent under the circumstances.  Although the government consistently denominates Breakway 100 a "thoroughfare" to liken it to a public highway, the fact remains that it is *not* a public roadway.  The Terminal stores thousands of large metal shipping containers that are constantly being transported along the Rows and Breakway 100 for loading and unloading from ships, trains, and semi-trucks.[200]  As Terminal Superintendent Wargo noted, it is important for drivers to "be alert in an environment [ ] where heavy machinery and heavy equipment are always moving."[201]  Teruya himself recognized how critical it was to be cautious when proceeding on Terminal roadways.[202]  Given the unique nature of the Terminal, it is not reasonable for an officer who has driven in the Terminal for 26 years to be traveling at a speed faster than the posted speed limit.

15.   The government counters Teruya's speed was nonetheless reasonable because he "had the right

---

[199]Although, as noted, the California Vehicle Code does not govern because the accident occurred on private property, see *Sills*, 33 Cal.App.2d at 228 ("If the phrase, 'the traffic laws and regulations,' referred to the rules of the road laid down in the Vehicle Code, they had no application to the instant case as the accident happened on a private road," citing *Gootar v. Levin*, 109 Cal.App. 703, 706 (1930)), the provisions of the code are instructive in considering the "degree of care and caution that an ordinarily careful and prudent person, acting in same or similar circumstances, would exercise" when driving on private roadways. *Sedie*, 2010 WL 1644252 at *11.

[200]SF 2; see also May 5 Morning RT at 107:14-18.

[201]May 5 Morning RT at 107:19-22.

[202]May 5 Afternoon RT at 266:18-267:1 ("Q. Officer Teruya, why were you glancing to your right and left prior to the accident when you had the right-of-way.  A. Well, I've been driving on the terminals for 26 years.  I know that you have to kind of keep your head on a swivel and always be looking around for traffic coming toward you.  So whenever I approach an intersection, I always do the – take a look at the left and to the right to see if there's any traffic coming.  You really have to be cautious on the terminals").

of way; [and] there were no traffic controls on Breakway."[203]  The court agrees that Teruya had the right of way, as he was traveling southbound on Breakway 100, which had no stop lines. Cantu did not have the right of way despite the fact that he was first to enter the intersection. Officer Canaria's uncontroverted testimony on this point is persuasive.  Canaria stated that Teruya had the right of way because he was proceeding south on Breakway 100, which had "no traffic signs or stop signs that would advise him . . . that he needed to stop for cross traffic"; Cantu, by contrast, was driving on Row S-200 and  "had a stop sign at the intersection."[204] Canaria's conclusion is consistent with the California Vehicle Code, which is instructive in evaluating the right of way on private property.[205]  As the California Court of Appeal has noted, "[t]he rule that the first automobile to enter an intersection has the right of way does not apply to an intersection where one of the two highways is a throughway protected from traffic by a stop sign." *Mittenhuber v. City of Redondo Beach*, 142 Cal.App.3d 1, 9 (1983).  "In such a situation, the driver on the [throughway] has a right to assume that the driver on the intersecting highway will obey the stop sign and yield him the right of way." *Ambra v. Woolsey*, 55 Cal.App.2d 104, 106 (1942) (citing *Lindenbaum v. Barbour*, 213 Cal. 277, 281 (1931); *Silva v. Market Street Railway Co.*, 50 Cal.App.2d 796, 799 (1942); *Inouye v. McCall*, 35 Cal.App.2d 634, 638 (1939); *Gritsch v. Pickwick Stages System*, 131 Cal.App. 774, 780 (1933)).

16.  Nonetheless, the law does not confer "an absolute and uncontrolled right upon the driver of a vehicle upon the highway over another vehicle about to enter [or cross the highway.]" *Sedie*, 2010 WL 1644252 at *14 (citing *Malone v. Perryman*, 226 Cal.App.2d 227, 234 (1964)).  Stated differently, although Teruya may have had the right-of-way, "he [wa]s not absolved of the duty to exercise ordinary care" under the circumstances. *Id.*  Rather, he remained under the duty to exercise due care, which included "look[ing] both ways before entering [the] intersection" and being "watchful of the direction in which danger is most likely to be apprehended." *Id.* at *11,

---

[203]Government Brief at 6.

[204]May 5 Afternoon RT at 250:6-251:13.

[205]*Id.* at 251:3-13.

14 (citing *Holibaugh v. Kishero Ito*, 21 Cal.App.2d 480, 486 (1937); *Malone*, 226 Cal.App.2d at 234).

17.   Teruya did not "keep [such] a vigilant lookout." *Id.* at *11 (citing *Boots v. Potter*, 122 Cal.App.2d 927, 935-36 (1954)).  As he approached the intersection of Breakway 100 and Row S-200, Teruya was not looking forward, nor was he looking to his left and right.  Cantu testified that immediately before the collision, he observed that Teruya was looking down.[206]  Teruya confirmed this; he stated that he was looking down and to his right prior to the collision.  Specifically, he asserted that he was looking under tractor trailer chassis loaded with shipping containers to determine if he could see the tires and bumpers of vehicles approaching the intersection from the right.[207]  The court does not find this testimony particularly credible.  Teruya was sitting in the driver's seat of a sport utility vehicle.  Given the height of the Explorer's windows and windshields, which appear to be at least as high as the clearance under the chassis, it is unclear how Teruya, from his vantage point, could have seen anything under the chassis.[208]  Teruya likely would not only have to have looked down, but bent from the waist down to see anything under the chassis.  Additionally, as is apparent from photographs taken at the accident scene, the tractor trailers were parked on the north side of Row S-200, perpendicular to the roadway as it proceeded west from the intersection with Breakway 100.  They were parked so that their wheels were at the north end of the trailers, i.e., not the side immediately abutting Row S-200.  As a consequence, when Teruya purportedly looked under the trailers' chassis to see oncoming traffic as he proceeded south on Breakway 100 toward the intersection, his view underneath the trailers would have been obstructed by the wheels and stanchions.  For all of these reasons, the court does not credit Teruya's testimony.[209]

---

[206]May 5 Morning RT at 58:3-14.

[207]May 5 Afternoon RT at 266:2-268:5.

[208]See generally Exhs. 193-195, 198–201.  See also May 6 Morning RT at 293:9-294:16.

[209]Cantu asserts that Teruya's testimony is also not credible because the right lane "would have been taking traffic away from him" and he thus could not have been looking in that direction for

18.   Considering the totality of the circumstances, the court concludes that Teruya did not act reasonably in operating his vehicle at a speed in excess of the posted speed limit at the Terminal, particularly considering that Breakway 100 is not a public highway, but a private roadway at the center of a dense, crowded, and busy industrial terminal.  Teruya also acted unreasonably in failing to look in front of his vehicle, and to the right and left for possible cross traffic, instead of looking down and away from the intersection and roadways moments before the accident. As a result, the court concludes that Teruya breached his duty of care in operating his vehicle on the day of the accident.

### 3.   Causation

19.   "In a negligence action, the plaintiff must show the defendant's act or omission (breach of duty) was a cause of the plaintiff's injury." *Vasquez v. Residential Investments, Inc.*, 118 Cal.App.4th 269, 288 (2004) (citing *Jackson v. Ryder Truck Rental, Inc.*, 16 Cal.App.4th 1830, 1846 (1993)). To prove causation, plaintiff must show: (1) that the defendant's breach of duty was a cause in fact of his injury; and (2) that defendant's breach was the proximate, or legal, cause of the injury. *Id.*; see also *Sandoval v. Bank of America*, 94 Cal.App.4th 1378, 1385 (2002) ("'In California, the causation element of negligence is satisfied when the plaintiff establishes (1) that the defendant's breach of duty (his negligent act or omission) was a substantial factor in bringing about the plaintiff's harm and (2) that there is no rule of law relieving the defendant of liability," citing *Leslie G. v. Perry & Associates*, 43 Cal.App.4th 472, 481 (1996); *Rosh v. Cave Imaging*

---

oncoming vehicles.  He also notes that Peck's accident reconstruction simulation did not show any containers to Teruya's right. (Cantu Brief at 7.) Cantu is mistaken. As the accident photographs make clear, Row S-200 is not a one-way roadway that runs westbound only.  Rather, it has two lanes and carries both eastbound and westbound traffic.  It is thus possible that traffic could have been approaching the Breakway 100 intersection from Teruya's right.

Cantu's argument that Teruya's testimony is undercut by Peck's simulation is similarly not persuasive.  Although the simulation does not show storage containers on tractor trailers to Teruya's right (see Exh. 285), Peck explained at trial that the simulation video did not recreate the entire environment – i.e., depict all containers located near the accident scene, but only the container that intruded into Breakway 100 on the northeast corner.  (See May 6 Afternoon RT at 419:2-9.) Given clear evidence that containers were stored to Teruya's right as he proceeded south on Breakway 100 (see Exhs. 193-195, 198-201), Cantu's argument is unavailing.

1   *Systems, Inc.*, 26 Cal.App.4th 1225, 1235 (1994); *Nola M. v. University of Southern California*,

2   16 Cal.App.4th 421, 427 (1993)); *Lombardo v. Huysentruyt*, 91 Cal.App.4th 656, 665 (2001)

3   ("One aspect of causation is cause in fact or actual cause: Was the defendant's conduct 'a

4   substantial factor in bringing about the injury.'  The other is legal or proximate cause," citing

5   *Mitchell v. Gonzales*, 54 Cal.3d 1041, 1049 (1991)).

### a.   Cause in Fact

7   20.   "An act is a cause in fact if it is a necessary antecedent of an event."  *State Dep't of State*

8   *Hospitals v. Superior Court*, 61 Cal.4th 339, 352 (2015) (citing *Ferguson v. Lieff, Cabraser,*

9   *Heimann & Bernstein*, 30 Cal.4th 1037, 1045 (2003)).  In cases such as this, where there are

10   allegedly multiple independent causes of a plaintiff's injury,  "California has definitively

11   adopted the substantial factor test of the Restatement Second of Torts for cause-in-fact

12   determinations."  *Rutherford v. Owens-Illinois, Inc.*, 16 Cal.4th 953, 968-69 (1997) (citing

13   *Mitchell v. Gonzales*, 54 Cal.3d 1041, 1044 n. 2, 1052 n. 7 (1991)).  Cf.  *State Dep't of State*

14   *Hospitals*, 61 Cal.4th at 352 n. 12 ("In cases where concurrent independent causes contribute

15   to an injury, we apply the 'substantial factor' test of the Restatement Second of Torts, section

16   423, which subsumes traditional 'but for' causation.  This case does not involve concurrent

17   independent causes, so the 'but for' test governs questions of factual causation," citing *Viner v.*

18   *Sweet*, 30 Cal.4th 1232, 1239-41 (2003)).  Under this standard, "a cause in fact is something that

19   is a substantial factor in bringing about the injury."  *Lineaweaver v. Plant Insulation Co.*, 31

20   Cal.App.4th 1409, 1414 (1995) (citation omitted).  It need not be the sole cause of plaintiff's

21   harm, however.  *In re Kelly*, 499 B.R. 844, 861 (S.D. Cal. 2013) (citing *Ileto v. Glock, Inc.*, 349

22   F.3d 1191, 1212 (9th Cir. 2003); *Pedeferri v. Seidner Enterprises*, 216 Cal.App.4th 359, 372-73

23   (2013)).  In practice, "[t]he substantial factor standard generally produces the same results as

24   does the 'but for' rule of causation which states that a defendant's conduct is a cause of the

25   injury if the injury would not have occurred 'but for' that conduct."  *Rutherford*, 16 Cal.4th at

26   969 (citing *Mitchell*, 54 Cal.3d at 1052-53; *Thomsen v. Rexall Drug & Chemical Co.*, 235

27   Cal.App.2d 775, 783 (1965)).

28   21.   Although, as discussed *infra*, Teruya's breach may not have been the sole cause of Cantu's

injury, it was a substantial factor in bringing about that harm.  Had Teruya not been speeding and had he been watching the road, it is likely that the collision with Cantu would not have occurred.

22.   The government counters that Teruya was not a cause in fact of the accident because, as a result of Cantu's actions, the accident was unavoidable.[210]  It contends that Teruya "lacked sufficient time either to perceive the hazard posed by Plaintiff's vehicle, or to react to the hazard by applying braking or swerving."[211]  The government cites Peck's testimony that Teruya had only an approximate 1.5 seconds to react to the hazard presented by Cantu's truck, but required at least 2.1 seconds.  Although the court has found Peck's testimony more credible than Brignola's regarding Teruya's perception response time, the court cannot agree that Teruya cannot be deemed to have been a cause in fact of Cantu's injuries because he did not have sufficient time to react to Cantu's truck prior to the accident.  As discussed *infra*, Teruya was unreasonably traveling in excess of the Terminal's 15 mile per hour speed limit at the time of the collision.  While Peck did not address how much time Teruya would have had to react to the presence of Cantu's truck had Teruya been traveling at the speed limit,[212] Brignola opined that he would have had approximately 3.2 seconds to react had he been traveling at 15 miles per hour.[213]  Assuming that is true, Teruya would have had nearly one second to avoid the collision.  As a result, the court cannot find that the accident was unavoidable whether or not Teruya breached his duty to operate his vehicle reasonably.

23.   For these reasons, the court concludes that Teruya's breach of duty was a substantial factor in bringing about Cantu's injury and finds that Cantu established that Teruya's breach was a cause

---

[210]Government Brief at 10 ("It is a maxim of California jurisprudence that 'No man is responsible for that which no man can control.'  From the instant that Officer Teruya saw Plaintiff's pickup truck in his peripheral vision, the accident was unavoidable.  Plaintiff's truck careened through the intersection too fast, and Officer Teruya did not have sufficient time to react").

[211]*Id.*

[212]May 6 Afternoon RT at 445:16-446:16.

[213]May 5 Afternoon RT at 133:1-134:23.

1    in fact of his injury.

2                    **b.    Proximate Cause**

3    24.    "The second aspect of [causation] 'focuses on public policy considerations.  Because the

4           purported [factual] causes of an event may be traced back to the dawn of humanity, the law has

5           imposed additional limitations on liability other than simply causality.'  'These additional

6           limitations are related not only to the degree of connection between the conduct and the injury,

7           but also with public policy.'  Thus, 'proximate cause is ordinarily concerned, not with the fact

8           of causation, but with the various considerations of policy that limit an actor's responsibility for

9           the consequences of his conduct.'"  *State Dep't of State Hospitals*, 61 Cal.4th at 353 (citing

10          *Ferguson*, 30 Cal.4th at 1045).

11   25.    "The doctrine of proximate cause limits liability; i.e., in certain situations where the defendant's

12          conduct is an actual cause of the harm, he will nevertheless be absolved because of the manner

13          in which the injury occurred.  Thus, where there is an independent intervening act which is not

14          reasonably foreseeable, the defendant's conduct is not deemed the 'legal' or proximate cause."

15          *Lombardo*, 91 Cal.App.4th at 666 (citing *Hardison v. Bushnell*, 18 Cal.App.4th 22, 26 (1993)).

16   26.    In this case, the risk that Teruya would collide with another vehicle while traveling faster than

17          the speed limit was reasonably foreseeable, particularly given how crowded Terminal roadways

18          were and the fact that Teruya was not attentive to traffic approaching him or traveling the cross-

19          street.  Consequently, the court concludes that Cantu adduced sufficient evidence to establish

20          that Teruya was a proximate cause of his injuries.  See, e.g., *Sedie*, 2010 WL 1644252 at *14

21          ("Here, if Mr. Rafael had not breached his duty of care, it is probable that the accident would

22          not have occurred.  Thus, Plaintiff has proven that it is more probable than not that Plaintiff's

23          injury occurred as a result of Mr. Rafael's failure to exercise due care in the operation of [the]

24          postal vehicle").  Cf. *Lombardo*, 91 Cal.App.4th at 666 ("The doctrine of proximate cause limits

25          liability; i.e., in certain situations, where the defendant's conduct is an actual cause of the harm,

26          he will nevertheless be absolved because of the manner in which the injury occurred. . . .  In

27          general, if the risk of injury is reasonably foreseeable, the defendant is liable," citing B. Witkin,

28          SUMMARY OF CALIFORNIA LAW, Torts § 628; RESTATEMENT (SECOND) OF TORTS §§ 435, 447).

                                                    47

### c.      Conclusion Regarding Causation

27.    For the reasons stated, the court concludes that Teruya's breach of his duty to operate his vehicle with due care was a cause in fact and proximate cause of Cantu's injuries.

### 4.      Conclusion Regarding Officer Teruya's Negligence

28.    Cantu has established that Teruya breached his duty to operate his vehicle with due care when he traveled in excess of the posted speed limit and that he acted unreasonably by not looking at the road ahead and checking for cross-traffic while driving on Breakway 100.  Cantu has also demonstrated that Teruya's breach caused his injuries.  As a result, the court concludes that Teruya was negligent in operating his vehicle.

### D.      Whether Cantu Was Negligent in the Operation of His Vehicle

29.    The government argued at trial and in its post-trial brief that Cantu was negligent in the operation of his vehicle and thus, under California comparative fault principles, his recovery must be reduced by his proportionate share of negligence.[214]  Cantu counters that he was not negligent because there was no credible evidence showing he was negligent.[215]

30.    As noted, "[u]nder the principles of comparative fault, a person's negligent conduct may be assigned a share of fault greater than zero percent only when the conduct was a substantial factor in the causation of the pertinent injuries." *Hernandez*, 226 Cal.App.4th at 1614 (citing *Chakalis*, 205 Cal.App.4th at 1572-73; *Stewart*, 190 Cal.App.4th at 33); see also *Sierra Pacific Industries*, 879 F.Supp.2d at 1134 (noting that comparative fault refers to "conduct on the part of the plaintiff which falls below the standard to which he should conform for his own protection, and is a legally contributing cause [cooperating] with the negligence of the defendant in bringing about the plaintiff's harm," citing *Gyerman*, 7 Cal.3d at 500; RESTATEMENT (SECOND) OF TORTS § 463).

31.    As the defendant, the government has the burden of establishing Cantu's negligence.  See *Pfeifer*, 220 Cal.App.4th at 1285 ("Generally, a defendant has the burden of establishing that

---

[214]Government Brief at 4-5, 8-11.

[215]Cantu Brief at 27-28.

some nonzero percentage of fault is properly attributed to the plaintiff," citing *Sparks*, 32 Cal.App.4th at 476).  See also, e.g., *Honea v. Matson Nav. Co.*, 336 F.Supp. 793, 795 (N.D. Cal. 1972) ("It is, of course, fundamental that the burden of establishing contributory negligence rests upon the defendant, unless such contributory negligence is shown by the plaintiff's own evidence or may be fairly inferred from all the facts and circumstances of the case").

### 1.   Duty

32.   The parties do not dispute that Cantu was under a duty to operate his vehicle with due care while driving on Terminal roadways; he had this duty on the day of the accident.  See, e.g., *Sedie*, 2010 WL 1644252 at *11 ("As the driver of the postal truck, Mr. Rafael was under a duty to operate his vehicle without negligence").

### 2.   Breach of Duty

33.   The government contends that Cantu acted unreasonably and thus breached his duty to operate his vehicle with due care by speeding, failing to stop at the stop line prior to entering the intersection, and failing to yield the right of way to Teruya.[216]

34.   Cantu counters that he was "attentive" and took appropriate action to avoid the collision.  As a consequence, he asserts, he did not breach his duty to operate his vehicle with due care.[217]  The court does not agree.

35.   Here, it is undisputed that Cantu was traveling in excess of the posted speed limit at the time of impact.  Brignola opined that Cantu was traveling 24 to 27 miles per hour while Peck concluded that he was traveling 32 miles per hour.  As noted, the court finds Peck's calculation more credible than Brignola's on this point, particularly given inconsistencies in Brignola's testimony as to whether his calculations assume that Cantu came to a complete stop at the Row S-200 stop line before proceeding into the intersection at Breakway 100.  As the court has noted respecting Teruya's conduct, traveling in excess of the posted speed limit was unreasonable given the unique nature of the Terminal.  Just as it is for a CBP officer who is at the Port on an almost

---

[216]Government Brief at 3-5, 8-10.

[217]Cantu Brief at 27-28.

49

daily basis, it is unreasonable for a longshoreman who works at the Terminal on a daily basis to be traveling more than two times the speed limit.

36.   Cantu appears to assert that his speed was not unreasonable under the circumstances because he was "accelerat[ing] out of danger."[218]  Even assuming he was accelerating at the time of impact, however, Peck opined that Cantu would have had to be traveling at approximately 22 miles per hour as he approached and entered the intersection.  This is still in excess of the speed limit and, in fact, exceeds Teruya's estimated speed.

37.   Cantu also acted unreasonably by entering the intersection without coming to a complete stop at the stop line.  Although Cantu testified that he had come to a complete stop, although perhaps "not on the line," the court finds his testimony not credible because it is directly refuted by the testimony of the parties' respective accident reconstructionists.  Peck testified that Cantu was traveling approximately 22 miles per hour when he crossed the stop line, while Brignola opined that at a minimum, it appeared Cantu had made a rolling stop or "California stop."  The California Vehicle Code which, as noted, is instructive in determining whether a driver on a private roadway acted with reasonable care, states that "[t]he driver of any vehicle approaching a stop sign at the entrance to, or within, an intersection shall stop. . . .  The driver shall yield the right-of-way to any vehicles which have approached from another highway, or which are approaching so closely as to constitute an immediate hazard, and shall yield the right-of-way to those vehicles until he or she can proceed with reasonable safety."  CAL. VEH. CODE § 21802. Cantu's failure to stop at the stop line is particularly significant here, as it is undisputed that his view of the traffic heading southbound on Breakway 100 was obstructed by a shipping container that intruded into Breakway 100 as he approached the intersection.

38.   Given the totality of the circumstances, the court concludes that Cantu acted unreasonably by failing to stop at the stop line and clear the visual obstruction prior to entering the intersection. This is particularly true given the speed at which he entered the intersection and the fact that cross-traffic traveling on Breakway 100 had no traffic control signals or stop lines and thus had

---

[218]*Id.*

50

1     the right of way.

2               **3.**      **Causation**

3   39.   The government also adduced sufficient evidence to establish that Cantu's breach of duty was

4         a substantial factor in causing his harm.  Although the court has found that Teruya was negligent

5         in operating his vehicle, thus contributing to the collision and Cantu's injuries, Teruya was not

6         the only cause of Cantu's injuries.

7   40.   As noted,  "[t]he substantial factor standard generally produces the same results as does the 'but

8         for' rule of causation which states that a defendant's conduct is a cause of the injury if the injury

9         would not have occurred 'but for' that conduct." *Rutherford*, 16 Cal.4th at 969 (citing *Mitchell*,

10        54 Cal.3d at 1052-53; *Thomsen*, 235 Cal.App.2d at 783).  Cantu's breach of his duty to operate

11        his vehicle with due care was a substantial factor in bringing about his injury because it is

12        unlikely that the accident would have occurred had he been traveling at the posted speed limit,

13        stopped at the stop line, and proceeded with caution past the shipping container to determine

14        whether southbound traffic with the right of way was approaching the intersection.

15   41.   The court also finds that Cantu's breach was a proximate cause of his injuries.  It is reasonably

16        foreseeable that a vehicle blindly proceeding through an intersection at an excessive speed

17        would be struck by cross-traffic that has the right of way, particularly where, as here, the vehicle

18        encounters a stop line and an object obstructing the driver's field of vision. See, e.g., *Sedie*,

19        2010 WL 1644252 at *14 ("Here, if Mr. Rafael had not breached his duty of care, it is probable

20        that the accident would not have occurred.  Thus, Plaintiff has proven that it is more probable

21        than not that Plaintiff's injury occurred as a result of Mr. Rafael's failure to exercise due care

22        in the operation of [the] postal vehicle"). Cf. *Lombardo*, 91 Cal.App.4th at 666 ("The doctrine

23        of proximate cause limits liability; i.e., in certain situations, where the defendant's conduct is

24        an actual cause of the harm, he will nevertheless be absolved because of the manner in which

25        the injury occurred. . . .  In general, if the risk of injury is reasonably foreseeable, the defendant

26        is liable," citing B. Witkin, SUMMARY OF CALIFORNIA LAW, Torts § 628; RESTATEMENT

27        (SECOND) OF TORTS §§ 435, 447).

28   42.   Because Cantu's breach of duty was both a substantial factor contributing to his injuries, as well

1    as a proximate cause of his harm, the court concludes that the government established causation

2    for purposes of a comparative negligence finding.

### 4.    Conclusion Regarding Cantu's Negligence

43.    In sum, the government established that Cantu breached his duty to operate his vehicle with due

care when he traveled in excess of the posted speed limit through a stop line and failed to clear

a visual obstruction and yield the right of way to cross-traffic on Breakway 100.  It has also

demonstrated that Cantu's breach was a substantial factor in causing his injuries and a proximate

cause of those injuries.  As a result, the court concludes that Cantu was negligent in the

operation of his vehicle.

### 5.    Allocation of Fault

44.    "California has a 'pure' comparative fault system that allocates fault in proportion to each

part[y' s] degree of fault regardless of who is more at fault.  In other words, California's pure

comparative law system establishes that a plaintiff can recover whatever percentage of fault,

however small, is apportioned to any defendant." *Munguia v. Bekins Van Lines, LLC*, Nos. 1:11-

cv-01134 LJO-SKO, 1:11-cv-01675 LJO-SKO, 2012 WL 5198480, *4 (E.D. Cal. Oct. 19, 2012)

(citing *Li*, 13 Cal.3d at 813).  See also, e.g., *Willis*, 2014 WL 1419239 at *12 ("Under

comparative fault, 'liability for damage will be borne by those whose negligence caused it in

direct proportion to their respective fault,'" citing *Bourland*, 2013 WL 4653195 at *4; *Aidan

Ming-Ho Leung*, 55 Cal.4th at 303).

45.    In cases involving a plaintiff whose negligence contributes to causing his injuries, the question

of comparative fault is a question for the trier of fact.  See, e.g., *Hernandez*, 226 Cal.App.4th at

1614 ("The comparative fault doctrine 'is designed to permit the trier of fact to consider all

relevant criteria in apportioning liability.  The doctrine 'is a flexible, comonsense concept, under

which a jury properly may consider and evaluate the relative responsibility of various parties for

an injury (whether their responsibility for the injury rests on negligence, strict liability, or other

theories of responsibility), in order to arrive at an 'equitable apportionment or allocation of

loss,'" citing *Knight v. Jewett*, 3 Cal.4th 296, 314 (1992); *Rosh v. Cave Imaging Systems, Inc.*,

26 Cal.App.4th 1225, 1233 (1994)).

46.   "[A]llocation of fault by the trier of fact is not subject to exact mathematical computations." *Ransom v. Calaveras Asbestos, Ltd.*, No. B207018, 2009 WL 531846, *8 (Cal. App. Mar. 4, 2009) (Unpub. Disp.); see also *Daly v. General Motors Corp.*, 20 Cal.3d 725, 742 (1978) ("The law consistently seeks to elevate justice and equity above the exact contours of a mathematical equation").  Rather, "[a]pportionment of fault involves the trier of fact engaging in an equitable assessment of the evidence." *Ransom*, 2009 WL 531846 at *8.  "Since the comparative fault doctrine was first adopted in California in *Li*[,] . . . [the California] Supreme Court has repeatedly acknowledged that it is designed to permit the trier of fact to consider all relevant criteria in apportioning liability." *Id.* (citing *Knight*, 3 Cal.4th at 314; *Henry v. Superior Court*, 160 Cal.App.4th 440, 461 (2008)).

47.   Viewing all of the evidence, the court concludes that Cantu was substantially more at fault for the accident than Teruya.  As the driver of the vehicle proceeding westbound on Row S-200, Cantu was required to stop at a stop line prior to entering the intersection.  In contrast, Teruya was not required to comply with any traffic control signs as he proceeded south on Breakway 100.  Officer Canaria concluded, and the court agrees, that under these circumstances, Teruya had the right of way.  While this did not "absolve[ ] [Teruya] of the duty to exercise ordinary care," he was entitled to assume that Cantu would "obey the stop [line] and yield him the right of way." *Ambra*, 55 Cal.App.2d at 106 ("Appellant cites many cases having to do with collisions in intersections which are not guarded by stop signs, and applying the familiar rule that the first automobile to enter the intersection has the right of way.  Such cases have no application to a collision in an intersection where one of the two highways is a boulevard protected from traffic on the other by stop signs.  In such a situation the driver on the boulevard has a right to assume that the driver on the intersecting highway will obey the stop sign and yield him the right of way" (citations omitted)).  Despite his testimony to the contrary, the weight of the evidence presented at trial demonstrated, and the court has found, that Cantu did not stop at the stop line, but instead entered the intersection at more than 20 miles per hour.  Even if the court were to credit Brignola's conclusion that Cantu performed a "California stop" before entering the intersection, Cantu's failure to stop at the intersection was unreasonable given the

fact that there was no stop line controlling traffic on Breakway 100 and that Cantu' view of approaching traffic was visually obstructed by a large shipping container that extended approximately eight feet into Breakway 100. Under such circumstances, a reasonably prudent driver would have stopped at the stop line and cautiously proceeded into the intersection until he or she had cleared the visual obstruction and determined whether there was approaching traffic on Breakway 100. Cantu, however, failed to do so, and traveled through the intersection at a speed more than twice the speed limit.

48. Although Teruya too was speeding, it is undisputed that he was traveling at a lower rate of speed than Cantu. Moreover, although Teruya's view of westbound traffic approaching the intersection was obstructed by the same shipping container such that he should have been more attentive to traffic entering the intersection from that direction, he was entitled reasonably to assume that such traffic would "obey the stop [line] and yield . . . the right of way." *Ambra*, 55 Cal.App.2d at 106. Additionally, although Teruya looked away from the road moments before the crash, it was unlikely, given the speed at which Cantu was traveling, that Teruya would have been able to appreciate the hazard and respond appropriately even had he been looking forward and checking for cross-traffic from the right or the left.

49. Viewing the totality of the circumstances, the court allocates the party's respective fault as follows: 70 percent to Cantu and 30 percent to the government based on Teruya's negligence.

**E.     Damages**

      **1.     Legal Standard Governing Awards of Damages Under FTCA and California Law**

50. Under the FTCA, federal courts must use the applicable state law standard in computing compensatory damages. See *Sedie*, 2010 WL 1644252 at *15 (citing 28 U.S.C. § 2674).

51. Under California law, the amount of damages a plaintiff can recover is "the amount which will compensate for all the detriment proximately caused [by the tortious act], whether it could have been anticipated or not." CAL. CIV. CODE § 3333. Damages are recoverable only to the extent they are reasonable, however. *Id.*, § 3359 ("Damages must, in all cases, be reasonable, and where an obligation of any kind appears to create a right to unconscionable and grossly

oppressive damages, contrary to substantial justice, no more than reasonable damages can be recovered").

52.   "Where the fact of damages is certain, the amount of damages need not be calculated with absolute certainty. The law requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation." *Michelson v. Hamada*, 29 Cal.App.4th 1566, 1585 (1994) (citing *GHK Associates v. Mayer Group, Inc.*, 224 Cal.App.3d 856, 873-74 (1990) (in turn citing *Channell v. Anthony*, 58 Cal.App.3d 290, 317 (1976); *Allen v. Gardner*, 126 Cal.App.2d 335, 340 (1954); *Noble v. Tweedy*, 90 Cal.App.2d 738, 745-46 (1949))). See also *Sedie*, 2010 WL 1644252 at *15 ("Although damages need not be proved to a mathematical certainty, 'sufficient facts must be introduced so that a court can arrive at an intelligent estimate without speculation or conjecture," citing *Harmsen v. Smith*, 693 F.2d 932, 945 (9th Cir. 1982)). Future damages should not be awarded if they are speculative. See CAL. CIV. CODE § 3283 ("Damages may be awarded, in a judicial proceeding, for detriment resulting after the commencement thereof, or certain to result in the future"); see also, e.g., *Scognamillo v. Herrick*, 106 Cal.App.4th 1139, 1151 (2003) ("Do not award a party speculative damages, which means compensation for future loss or harm which, although possible, is conjectural or not reasonably certain" (citation omitted)).

53.   Moreover, "every injured person, regardless of the manner and extent of the injury, is obligated to take reasonable steps to mitigate his or her injuries or loss." *Sedie*, 2010 WL 1644252 at *16 (citing *Guerrieri v. Severini*, 51 Cal.2d 12, 23 (1958)); see also *Valle de Oro Bank v. Gamboa*, 26 Cal.App.4th 1686, 1691 (1994) ("The doctrine of mitigation of damages holds that '[a] plaintiff who suffers damage . . . has a duty to take reasonable steps to mitigate those damages and will not be able to recover for any losses which could have been thus avoided'" (citation omitted)). "'The rule of [mitigation of damages] comes into play after a legal wrong has occurred, but while some damages may still be averted.'" *Sierra Pacific Industries*, 879 F.Supp.2d at 1136 (quoting *Pool v. City of Oakland*, 42 Cal.3d 1051, 1066 (1986)). "Under the doctrine, '[a] plaintiff may not recover for damages avoidable through ordinary care and reasonable exertion. However, '[t]he duty to mitigate damages does not require an injured party

1   to do what is unreasonable or impracticable.'" *Agam v. Gavra*, 236 Cal.App.4th 91, 111 (2015)

2   (citation omitted)).

3          **2.**    **Cantu's Damages**

4          **a.**    **Past Medical Expenses**

5   54.   "A person injured by another's tortious conduct is entitled to recover the reasonable value of

6   medical care and services reasonably required and attributable to the tort." *Hanif v. Housing*

7   *Authority*, 200 Cal.App.3d 635, 640 (1988).

8   55.   Cantu asserts he is entitled to damages of $26,473.99 for the cost of his medical treatment

9   between April 19, 2011 and March 7, 2012.[219]  The government disputes this, asserting that

10   Cantu is not entitled to recover damages for medical expenses incurred after Dr. Miller examined

11   him on August 17, 2011.  It contends that, as of that date, Cantu was healed,[220] and any future

12   medical treatment was not "reasonably required [or] attributable to the tort." *Hanif*, 200

13   Cal.App.3d at 640.

14   56.   Dr. Loddengaard testified that Cantu's shoulder injury was a "garden variety-type injury" that

15   would likely have required physical therapy twice a week for six weeks.[221]  He also stated that

16   the shoulder injury would likely have taken "a couple of months to settle down."[222]  This

17   testimony was consistent with both Dr. Miller's and Dr. Tauber's conclusion that Cantu had

18   suffered a soft tissue injury and that his injuries were fully healed four months after the accident,

19   i.e., on August 17, 2011.[223]  Although Dr. Loddengaard opined that it was nonetheless medically

20   necessary and reasonable for Cantu to stay out of work and under medical care for 47 weeks, the

21   court did not find his testimony on this point credible.

22   57.   Cantu argues that Dr. Loddengaard's testimony should be credited over the testimony of Drs.

23   _____

24   [219]Cantu Brief at 23.

25   [220]Government Brief at 11-15.

26   [221]*Id.* at 197:20-198:5.

27   [222]Exh. 263.

28   [223]May 6 Morning RT at 333:23-334:23, 362:13-18.

Miller and Tauber because he was Cantu's treating physician and was not retained to provide trial testimony.[224]  In contrast, he asserts that Dr. Miller's testimony "is clearly biased" because he testifies as an expert on behalf of workers compensation carriers and that Dr. Tauber's testimony is also biased because he was retained by the government.[225]  The court does not agree that Dr. Loddengaard's testimony was more credible than that of the government's witnesses solely because Dr. Loddengaard was Cantu's treating physician.  Although Dr. Miller admitted on cross-examination that he is retained by defendants in a majority of cases in which he testifies as an expert,[226] Dr. Loddengaard stated that he testifies for plaintiffs in worker's compensation proceedings 80 to 90 percent of the time.[227]  Although Dr. Loddengaard was Cantu's treating physician rather than a retained expert, his testimony must be discounted to the same extent as Dr. Miller's and Dr. Tauber's given the fact that he treats and/or testifies for plaintiffs in an overwhelming percentage of the cases on which he works and the fact that Cantu's lawyer referred him to Dr. Loddengaard.  Dr. Loddengaard acknowledged at trial that Cantu's lawyer and his partner have referred more than 100 patients to him; nearly all of these referrals involved worker's compensation claims.[228]  As respects Dr. Tauber, while it is true that the government retained him to testify in this case, the court ascribes less importance to this fact given that he stated he testified equally for plaintiffs and defendants, and that he has testified against the

---

[224]Cantu Brief at 16 ("It remains uncontroverted that plaintiff treated with Dr. Loddengaard, who eventually released him to return to work.  Dr. Loddengaard was not retained to provide trial testimony. As a treating physician, he is the only doctor in this case who actually owed a duty to try to get Mr. Cantu well. . . .  Dr. Loddengaard, as a treating physician, knows the case more intimately than defense experts who see Mr. Cantu once and take no responsibility for his care.  Dr. Loddengaard has treated Mr. Cantu and observed his condition firsthand").

[225]*Id.* at 16-17.

[226]May 6 Morning RT at 340:3-341:3.

[227]May 5 Afternoon RT at 191:24:-192:6.

[228]*Id.* at 190:24-192:10.

1    government on various occasions.[229]

2    58.   More fundamentally, the court does not find Dr. Loddengaard's testimony regarding the extent

3          of Cantu's injuries and treatment credible given the lack of objective findings supporting his

4          treatment decisions.

5    59.   Dr. Loddengaard's testimony focused primarily on Cantu's subjective complaints concerning

6          pain or stiffness in his back, shoulder, and neck and Cantu's belief as to whether the conditions

7          had improved since his last appointment.[230]   Although Dr. Loddengaard testified that he

8          examined Cantu, and his treatment notes reflect examinations, he provided little information

9          concerning the nature or substance of the physical examinations and whether his findings were

10         based on objective or subjective criteria.  Dr. Loddengaard's treatment notes, moreover, are of

11         little assistance in determining the basis of his findings.  For example, while Dr. Loddengaard

12         reported "positive" findings for various rotator cuff tests, his notes do not explain whether these

13         findings were based on objective or subjective criteria – such as Cantu's complaints while the

14         tests were being performed.[231]   In those instances where Dr. Loddengaard noted comments

15         concerning his physical examinations, moreover, the notes reflect that many of his findings were

16         subjective.  By way of example, Dr. Loddengaard reported, in measuring Cantu's range of

17         motion, that Cantu reported "pain in all directions."[232]   As Drs. Miller and Tauber testified at

18         trial, a patient's complaints of pain with movement are of limited utility in arriving at an accurate

19         diagnosis; instead, a doctor's diagnosis and treatment plan should be based on objective,

20         physiological findings; these type of findings are not apparent in Dr. Loddengaard's treatment

21         notes.   Dr. Tauber's testimony suggested a likelihood that Dr. Loddengaard's examination

22

23         [229]May 6 Morning RT at 355:4-8.

24         [230]See generally May 5 Afternoon RT at 160:2-178:13; Exhs. 263-276.

25         [231]See, e.g., Exhs. 266 at 3; 267 at 2; 268 at 2, 269 at 2.

26         [232]See, e.g., Exh. 268 at 3; Exh. 269 at 2.  The notes also report "popping in AC joint with
27    motion."  (*Id.*)  As discussed *infra*, while such a finding is objective, the court does not credit Dr.
      Loddengaard's testimony that it indicated trauma to Cantu's AC joint, particularly given Dr. Miller's
28    observation that the same popping sound could be heard in Cantu's healthy right shoulder.

findings were largely subjective.  He explained that he performed many of the same tests Dr. Loddengaard had – i.e., the Hawkins sign and internal rotation of the AC joint – and that his only findings were subjective – i.e., Cantu's complaints of pain related to the exercises.[233]  Dr. Miller also testified that there were no objective findings supporting Cantu's subjective complaints of pain during the physical examination he conducted, and that he could not identify any objective findings in Dr. Loddengaard's treatment notes.[234]  Given the governments' experts' uncontroverted testimony that subjective findings are of limited utility in determining a diagnosis and whether medical treatment is appropriate,[235] the court finds Dr. Loddengaard's testimony concerning the extent of Cantu's injuries unpersuasive.

60.  Moreover, with respect to the objective finding Dr. Loddengaard did note, i.e., the "popping" of the AC joint while moving,[236] this does not appear to be indicative of an AC joint impingement to which Dr. Loddengaard attributed it.  As Dr. Miller testified, Cantu presented with the same popping sound in his right shoulder, which was in good health.[237] Based on Dr. Loddengaard's testimony and examination notes, it does not appear that he ever examined Cantu's right shoulder.  Both Drs. Miller and Tauber, moreover, explained that the popping sound was not indicative of an impingement, but is something that routinely occurs in healthy individuals.[238]  They also testified that, apart from the popping, there were no objective findings that would support the diagnosis of an impingement, as both an x-ray and MRI showed no trauma or damage to the AC joint.[239]   Given the lack of objective findings and Dr.

---

[233]May 6 Morning RT at 359:1-360:10.

[234]*Id.* at 325:9-326:8, 331:23-332:11.

[235]See, e.g., *id.* at 360:11-14.

[236]May 5 Afternoon RT at 205:21-206:12.

[237]May 6 Morning RT at 325:19-326:2.

[238]*Id.* at 325:24-327:5, 362:21-365:15.

[239]*Id.* at 333:8-13, 362:13-18, 365:11-25.

1   Loddengaard's primary reliance on Cantu's subjective complaints, the court finds that his

2   testimony is entitled to little weight.

3   61.   Cantu argues that Dr. Loddengaard's conclusions are independently validated by the findings

4   of Dr. James Deutsch, who performed an ADA evaluation of Cantu on June 7, 2012, at the

5   request of the Pacific Maritime Association.[240] In his report, Dr. Deutsch noted that he examined

6   Cantu's neck and left shoulder.  He found that there was tenderness on the left side of Cantu's

7   neck and that Cantu's AC joint was tender.  He also concluded that Cantu had a slightly reduced

8   range of motion in his left shoulder and pain that accompanied such motion.[241]   Like Dr.

9   Loddengaard, Dr. Deutsch diagnosed AC separation and shoulder impingement and concluded

10   that Cantu was entitled to ADA accommodations upon his return to work.[242]   While Cantu is

11   correct that Dr. Deutsch is the only doctor who offered an "independent" evaluation of Cantu

12   in the sense that he is not associated with either party, the court finds his report of limited utility.

13   The report is only two and one-half pages long; only nine lines concern his evaluation of Cantu

14   and his diagnoses.  Dr. Deutsch did not detail the tests that he performed or what objective and

15   subjective findings he made.  Because Dr. Deutsch did not testify at trial, he was unable to

16   expound on the minimal information in the report or explain the information on which he relied

17   in making a diagnosis.  This is significant, as it appears possible that Dr. Deutsch relied on Dr.

18   Loddengaard's evaluation of Cantu and Dr. Loddengaard's diagnoses in making his own

19   diagnosis and determining that Cantu was entitled to an ADA accommodation.[243]   A good

20   portion of his short, two-page report is dedicated to describing Dr. Loddengaard's diagnoses,

21   belief that Cantu needed surgery, and conclusions regarding ADA disability.[244]" To the extent

22

23   [240]Cantu Brief at 20.

24   [241]Exh. 280 at 2.

25   [242]Id. at 2-3.

26   [243]Id. at 1

27   [244]See Exh. 280 at 1 ("[Cantu] has been told by Dr. Loddengaard that he has AC separation and

28   a possible rotator cuff tear and that due to the lack of progress with conservative treatment his best

Dr. Deutsch relied on Dr. Loddengaard's diagnoses, his diagnosis and Dr. Loddengaard's are equally unpersuasive for reasons already stated. Even assuming Dr. Deutsch did not rely substantially on Dr. Loddengaard's findings, however, the court accords Dr. Deutsch's report little weight, given its brevity and the lack of any testimony explaining why he reached those conclusions.

62. In sum, the court finds Drs. Tauber and Miller more credible than Dr. Loddengaard. As an initial matter, Dr. Tauber admitted that Cantu suffered serious injuries resulting from the car accident and conceded that all medical treatment and physical therapy provided for the first four months following the accident was reasonable and medically necessary. He testified that he could not make an objective finding of injury to Cantu's AC joint, notwithstanding Cantu's complaints and Dr. Loddengaard's findings.[245] Although Cantu correctly notes that Dr. Tauber's examination occurred after he had been back at work for two years, Dr. Tauber's findings were consistent with those of Dr. Miller, who evaluated Cantu four months after the accident. Unlike Dr. Loddengaard, Dr. Miller examined both of Cantu's shoulder joints and observed the popping sound, which Dr. Loddengaard attributed to impingement of the AC joint, in both shoulders, i.e., the left shoulder and Cantu's healthy right shoulder. Dr. Miller also noted that Cantu had no objective physical manifestations of trauma to the his AC joint. The court found particularly persuasive Dr. Miller's testimony that during the examination, when Cantu was asked the source from which pain was emanating, he did not identify his AC joint.[246] The portion of the shoulder that Cantu stated was painful – the front and back – is the area that Dr. Tauber found tender

---

course of treatment is arthrosporic surgery of his left shoulder. However, at this time, the patient does not wish to proceed with the surgery and would like to continue with conservative treatment and restrictions of his activities to anticipate that hopefully his injuries will heal. Based on his evaluations, Dr. Loddengaard has stated that the patient has significant abnormality that qualifies for ADA and that he has functional limitations and work restrictions consisting of no heavy lifting, no prolonged standing, no overhead work, no climbing, no operating heavy equipment and, based on those restrictions, specifically stating that the patient should not signal")

[245]May 6 Morning RT at 360:10-14, 364:6-20.

[246]*Id.* at 327:3-331:8.

1        during his physical evaluation.[247]

2  63.    The court also found persuasive Dr. Miller's testimony that although Cantu asserted he could

3        not extend his arm above 90 degrees without pain, at 90 degrees, which represents maximum

4        muscle contract, he did not experience pain when extending his arm.  As Dr. Miller observed,

5        this objective observation calls into question Cantu's subjective complaints of pain when

6        extending his arm above 90 degrees because he experienced no pain when all of his muscles

7        were at maximum contraction.[248]

8  64.    Based on all of the evidence presented at trial, the court finds Drs. Tauber and Miller more

9        credible than Dr. Loddengaard, and concludes that it was not medically necessary or reasonable

10       for Cantu to continue to receive treatment for more than four months after the accident.  As a

11       result, the court finds Cantu that reasonably incurred damages of $6,034.43 for past medical

12       expenses resulting from the accident.[249]  This represents the expenses he incurred for four

13       months after the accident.

14              **b.**    **Past Lost Wages**

15  65.    Damages for lost wages must not be speculative.  *Engle v. Oroville*, 238 Cal.App.2d 266, 273

16        (1965).  Further, a plaintiff has a duty to mitigate damages and cannot recover lost wages he

17        could have avoided through reasonable efforts.  *Thrifty-Tel, Inc. v. Bezenek*, 46 Cal.App.4th

18        1559, 1568 (1996).  "If a plaintiff, by [his] own action, unnecessarily enhances [his] loss [he]

19        may not recover such enhanced loss." *Lewis v. Superior Court*, 77 Cal.App.3d 844, 853 (1978)

20        (quoting *Green v. Smith*, 261 Cal.App.2d 392, 399 (1967)).

21  66.    Cantu contends he lost wages of $93,135.92 during the 47 weeks he was out of work between

22        April 19, 2011 and March 7, 2014.[250]  Cantu's calculation of gross wages is based on an annual

23        extrapolation of the gross wages he was paid during the first quarter of 2011; he calculates that

24

25    [247]*Id.* at 359:12-14.

26    [248]*Id.* at 328:1-331:8.

27    [249]See Exh. 260.  See Government Brief at 15; Cantu Brief at 23.

28    [250]Cantu Brief at 24.

he received $25,761 in total wages during that quarter.  Cantu converts this to an annual salary of $103,044; he uses that number to calculate a weekly salary and multiplies that amount by the 47 weeks he was out of work.[251]  The government contends the calculation results in excessive damages given Cantu's failure to mitigate his damages.  It asserts that the court should not assess damages for lost wages beyond August 17, 2011, because Cantu could have returned to work at that point.[252]

67.   The court agrees with the government that Cantu's claimed lost wages are not reasonable.  As noted, the court has concluded that the medical expenses Cantu incurred after August 17, 2011, were not medically necessary or reasonable to treat the injuries he suffered as a result of the April 2011 accident.  Having credited Dr. Miller's and Dr. Tauber's testimony, the court finds that Cantu failed to mitigate damages by failing to return to work after August 17, 2011, when his shoulder had healed.

68.   Cantu counters that even if medical treatment was not medically necessary after that date, it was reasonable for him to remain out of work for 47 weeks because he "routinely took painkillers, such as Vicodin, which [impaired] his ability to [work] around the heavy and dangerous equipment at the waterfront, [and this] forc[ed] him to remain off work."[253]  The court is not persuaded.  While it is uncontroverted that Dr. Loddengaard prescribed Vicodin and Vicodin Extra Strength for Cantu, and that an individual should not work at the Terminal while taking narcotics, such as Vicodin,[254] there was no evidence introduced concerning the frequency with

---

[251]*Id.*  Although Cantu asserts he earned $25,761 during the first quarter of 2011, his payroll records, which were introduced, show that his gross wages for that quarter were $27,554.14. (See Exh. 253 at USA00941.)  Cantu does not explain the calculation that yielded the $25,761 figure in his post-trial brief, and the court cannot discern how he arrived at that figure.  Using the gross wages reported on Cantu's payroll records, his first quarter 2011 earnings indicate an annualized salary of $110,216.56, and a weekly of $2,119.55.  Multiplied by 47 weeks, the total lost wages Cantu seeks to recover would be $99,618.85, rather than the $93,135.92 discussed in his post-trial brief.

[252]Government Brief at 16.

[253]Cantu Brief at 24.

[254]May 5 Afternoon RT at 162:18-21, 188:17-23.

63

which Cantu took such drugs. As a result, the court cannot conclude it was reasonable for Cantu to remain out of work after seeing Dr. Miller on August 17, 2011, on the basis that he was taking Vicodin.

69.   Although Cantu testified that Dr. Loddengaard continued to prescribe Vicodin following Dr. Miller's examination on August 17, 2011, he did not testify that he took Vicodin regularly or at times of the day – i.e., morning or afternoon – during which he would have been working at the Terminal.[255] In fact, based on Dr. Miller's testimony, it appears that in during time period, Cantu regularly took only Motrin; this would not have precluded a return to work.[256] Given the lack of any evidence in the record suggesting that Cantu took Vicodin during work hours on a regular basis, the court cannot find from the mere fact Dr. Loddengaard prescribed the drug, or that Dr. Tauber would not have objected to such a prescription,[257] that Cantu could not have returned to work following his August 17, 2011 evaluation by Dr. Miller.

70.   The court therefore finds that Cantu's damages for past lost wages must be limited to the seventeen weeks between April 19, 2011 and his evaluation by Dr. Miller on August 17, 2011, when Dr. Miller found he had healed and could return to work.[258] In calculating such damages,

---

[255]May 5 Morning RT at 64:18-65:8.

[256]May 6 Morning RT at 341:7-13.

[257]*Id.* at 375:11-16.

[258]In his post-trial brief, Cantu argues that the government and its experts' assessment of Cantu's fitness for work was based on "confusion" related to Cantu's regular job duties. (Cantu Brief at 15-16.) He notes that he normally engaged in heavy physical labor in the course of his employment and thus "could not perform physical labor" as required for his job because of limitations related to his shoulder. (*Id.*) Cantu asserts that Dr. Loddengaard's testimony related to Cantu's injuries and his ability to return to work should be credited over that of Drs. Miller and Tauber because "Dr. Loddengaard exhibited knowledge of the longshore industry," "has treated numerous longshoremen," and "understands the physical requirements of the work," whereas the same was not true for the other doctors. (*Id.* at 16.) The court is not persuaded.

Contrary to Cantu's arguments, both Drs. Miller and Tauber testified at trial that they have treated longshoremen and are aware of the physical requirements of such work. Each doctor also stated that he took such knowledge into account when considering whether Cantu could return to work, without restrictions, on August 17, 2011. (See, e.g., May 6 Morning RT at 314:14-20, 332:5-25, 343:4-344:21, 349:4-24 (Dr. Miller's testimony); *id.* at 373:4-374:24 (Dr. Tauber).) Because Drs. Miller and

the court declines to adopt Cantu's proposed methodology, i.e., annualizing Cantu's wages for the first quarter of 2011, as it believes such a calculation is unduly speculative here. As evidenced by Cantu's earnings records, Cantu's wages generally fluctuated from year to year and quarter to quarter.[259] It is thus unclear that Cantu would have earned an amount similar to what he earned in the first quarter of 2011 for the remainder of the year. Indeed, it appears that on many days during the first quarter Cantu was "elevated" to a position with 10 guaranteed hours of work and higher hourly rates.[260] As Cantu testified at trial, there is "no telling" when such elevations will be offered; they often occur "without warning."[261] Accordingly, it is speculative to assert that Cantu's wages for the remainder of 2011 would have been similarly high given the irregularity of the elevated position work Cantu was offered during the first quarter of 2011. Instead, the court believes that it is appropriate to calculate Cantu's lost wages based on his gross earnings for the year preceding his injury. The court believes that such wages are less speculative – as they represent wages actually earned and the frequency of elevations over the course of a year as opposed to a single quarter. As noted, Cantu earned $95,977.08 in the four quarters preceding the accident – i.e., the second quarter of 2010, third quarter of 2010, fourth quarter of 2010, and first quarter of 2011.[262] This amounts to weekly earnings of $1,845.71.

71. The court therefore finds that Cantu's damages for past lost wages total $31,377.07, which

---

Tauber were familiar with Cantu's typical job duties and the physical requirements of longshoring and took such knowledge into account when determining Cantu's fitness for work, the court finds Cantu's contention that Dr. Miller's and Dr. Tauber's conclusions should be discounted based on their lack of familiarity with Cantu's typical job duties to be unavailing.

[259]See Findings of Fact ¶¶ 102-08; see also generally Exh. 253.

[260]See Exh. 253 at USA00940-00941.

[261]See May 5 Morning RT at 38:12-20.

[262]See Exh. 253 at USA00936-941. Cantu earned $20,229.43 in gross wages for the second quarter of 2010 (see *id.* at USA00936); $22,359.82 in gross wages for the third quarter of 2010 (see *id.* at USA00938); $25,833.69 in gross wages for the fourth quarter of 2010 (see *id.* at USA00939); and $27,554.14 in gross wages for the first quarter of 2011 (see *id.* at USA00941).

represents wages for the time he was out of work between the accident on April 18, 2011 and

the date on which his shoulder healed, August 17, 2011.[263]

### c.  Future Medical Expenses

72.  To recover damages for future medical expenses, a plaintiff must show: (1) the reasonable value

of each of the expected future medical charges; (2) that the future medical care, services, or

suppliers are reasonably certain to be needed in treating the injury; and (3) that the condition

requiring future medical care is casually connected with injuries inflicted by the defendant.

*Sedie*, 2010 WL 1644252 at *20 (citing CAL. CIV. CODE 3282; *Hoffman v. Southern Pacific Co.*,

---

[263]Cantu also argues that he is entitled to an additional $37,700 in past lost wages, which purportedly represents the earnings differential between the wages earned by Cantu at a longshoreman's basic hourly rate of $35.68 per hour and the hourly rate for top handler operators – i.e., the "Skill III" longshoreman hourly rate – of $41.48 per hour. (Cantu Brief at 24-25.)  He asserts that he is entitled to recover the differential earnings as past lost wages because "[b]ut for his time off work which is claimed as a result of this injury, [he] would have been eligible for additional training as a top handler operator, which makes an hourly wage of $41.48, for work which would have been readily available to him." (*Id.* at 21-22.)  At trial, Cantu testified that class A basic longshoremen like himself are eligible for training to operate top handlers – trucks that move shipping containers – which qualifies as "Skill III work." Under the Pacific Coast Longshore Contract, such work guarantees a minimum of ten, rather than eight, hours of work each day and pays at a higher hourly rate of pay. (See May 5 Morning RT at 71:2-76:17.)  Cantu's contention that he is entitled to lost wages reflecting the differential between his rate of pay as a longshoreman and as a Skill III top handler operator is unpersuasive, however, as such wages appear to be speculative based on the record submitted at trial.

As an initial matter, Cantu's argument assumes that he would have been eligible for a top handler wage beginning the day after the accident; it is unclear how this could be the case, however, given the fact that Cantu undisputedly would have been required to undergo *training* before being able to perform Skill III duties and being entitled to receive Skill III wages. Although Cantu testified that class A basic longshoreman with similar experience are eligible for such training, he did not testify as to the frequency of the training. Without such testimony, the court is left with nothing but speculation as to when Cantu would have purportedly been training and thus eligible to receive a higher hourly rate.  More fundamentally, Cantu's argument that he is entitled to such past wages is grounded in his assertion that all of his time off work was medically necessary to treat his shoulder injury. Indeed, he contends that "[b]ut for his time off work which is claimed as a result of this injury, [he] would have been eligible for [top handler operator] training." (Cantu Brief at 21.)  As the court has discussed at length *supra*, however, it was unreasonable for Cantu to remain off work beyond August 17, 2011 – the date on which his injuries were fully healed. Accordingly, it appears that the missed opportunities for training were largely a result of Cantu's failure to return to work after he had fully healed, rather than as a direct result of his accident.  For all these reasons, the court concludes that Cantu has failed to proffer sufficient evidence to raise his claim for such past lost wages above the speculative level and the court declines to award them as damages here. See, e.g., *Engle v. Oroville*, 238 Cal.App.2d 266, 273 (1965) (holding that damages for lost wages must not be speculative).

1   101 Cal.App.218, 229-30 (1929)).  An award of future medical expenses is inappropriate if the

2   medical expenses are speculative.  *Garcia v. Duro Dyne Corp.*, 156 Cal.App.4th 92, 97 (2007).

3   73.   Cantu contends he will likely incur future medical expenses of $13,000 to $15,000 for shoulder

4   surgery consisting of subacromial decompression and distal clavicle resection.[264]   The

5   government counters that Cantu failed to prove that Cantu is reasonably certain to require this

6   future care and that it is medically necessary to treat his left shoulder injury.[265]

7   74.   Dr. Loddengaard testified that in September 2011, he began to discuss with Cantu the need for

8   a surgical subacromial decompression and distal clavicle resection.[266]   In his final report, he

9   opined that future surgery would be required because Cantu's shoulder would not improve

10   further.[267]   Both Drs. Miller and Tauber opined, however, that shoulder surgery would be

11   inappropriate because Cantu's shoulder was fully healed as of August 17, 2011.[268]  Dr. Miller

12   testified additionally that surgery on a Grade 1 AC sprain is inappropriate because the AC joint

13   is not dislocated, but rather has been sprained, such that a surgery requiring removal of portions

14   of the AC joint would be unnecessary.[269]

15   75.   For the reasons already discussed, the court finds Dr. Miller's and Dr. Tauber's testimony more

16   credible on this issue than Dr. Loddengaard's.  As respects Dr. Loddengaard's conclusion that

17   Cantu needed surgery, both Drs. Miller and Tauber observed that he had made no objective

18   finding of an impingement, which is the finding that underlies his conclusion that surgery is

19   required.  Indeed, Dr. Tauber testified at length that there was no evidence of an impingement,

20   making the need for surgery speculative.  He noted specifically that the popping sound on which

21

22   _____

23   [264]Cantu Brief at 26.

24   [265]Government Brief at 15-16.

25   [266]May 5 Afternoon RT at 171:19-172:5.

26   [267]*Id.* at 180:2-12.

27   [268]See May 6 Morning at 333:14-22, 369:22-370:6.

28   [269]*Id.* at 333:14-22.

Dr. Loddengaard based his surgical recommendation was a fairly regular occurrence and was not indicative of an impingement.[270]   The court finds Dr. Tauber's observations particularly persuasive on this point, as he examined Cantu most recently – in January 2015 – and made no objective findings of continuing injury to Cantu's AC joint.  Dr. Loddengaard's final evaluation and recommendation, by contrast, were made in 2012, before Cantu had returned to work.  Dr. Miller offered uncontroverted testimony that returning to work is beneficial in helping soft-tissue injuries heal.  It is thus reasonable to conclude that the fact Cantu returned to work strengthened his shoulder, as Dr. Miller opined.  Even accepting Dr. Loddengaard's testimony that surgery may have been appropriate in 2012, therefore, the evidence does not reflect that it is reasonably necessary now.

76.   In sum, the court concludes that Cantu has shown only a speculative need for future medical care.  As a result, the court declines to award damages for future medical care.

### d.   Future Lost Wages

77.   "Damages for the loss of future earnings . . . are recoverable 'where the evidence makes reasonably certain their occurrence and extent.'"  *Sedie*, 2010 WL 1644252 at *20 (quoting *Kids' Universe v. In2Labs*, 95 Cal.App.4th 870, 883 (2002)).

78.   Cantu seeks a $38,242.00 award for future lost wages during the four months he will be out of work following the anticipated shoulder surgery.[271]

79.   Because Cantu has failed to show that this future medical care is reasonably necessary to treat injuries resulting from the April 2011 accident, the court declines to award damages for future lost wages attributable to the four months he estimates he will be unable to work following the surgery.

80.   Cantu also argues that the accident and his resulting injuries have prevented him from training for higher skilled work and from receiving certain promotions, each of which would result in an increased rate of pay.  As a result, Cantu contends that he is entitled to an unspecified amount

---

[270]*Id.* at 363:17-364:9.

[271]Cantu Brief at 25.

of damages based on his purported lost earning capacity resulting from the accident.[272]  The court is not persuaded.  With respect to the potential for higher skilled work, as the court has discussed,[273] Cantu's assertions that he will be unable to train for Skill III work, which demands a higher rate of pay, are based on Dr. Loddengaard's assessment that Cantu requires additional medical care and will continue to have limitations related to the use of his left shoulder.[274]  As discussed *supra*, the court has rejected Dr. Loddengaard's testimony in this regard and credited the conclusions of Drs. Miller and Tauber, who have concluded that Cantu's shoulder is fully healed and he no longer has any limitations related to the use of his left shoulder.  As a result, the basis for Cantu's contention that he will be prevented from training for and receiving Skill III work in the future is speculative and unsupported by the record.  As respects Cantu's assertions that he has "missed out on th[e] opportunity" for elevation to foreman status because of his injuries from the accident,[275] the court finds that any future earnings associated with such promotions are speculative and not properly awarded as damages.  As an initial matter, it is uncontroverted that opportunities for elevations and permanent promotions arise irregularly and it is thus not at all clear that such an opportunity will arise in the future,[276] as Cantu asserts.  More fundamentally, Cantu has proffered no evidence that plausibly suggests that any failure of his to obtain a promotion in the past – or any potential failure to obtain one in the future – was attributable to the accident, particularly when his injuries were fully healed four months after the accident.  The court thus concludes that Cantu has failed to proffer evidence of future earning capacity associated with his past injuries.  Because any such damages would be speculative, the court declines to award such damages for future lost wages.  Cf. *Sedie*, 2010 WL 1644252 at *20 ("Damages for the loss of future earnings . . . are recoverable 'where the evidence makes

---

[272]*Id.* at 21-22.

[273]See *supra* note 263.

[274]See Cantu Brief at 21.

[275]*Id.* at 22.

[276]See May 5 Morning RT at 38:12-39:18, 83:13-17

1    reasonably certain their occurrence and extent'" (citation omitted)).

### e.    Non-Economic Damages

81.    A plaintiff may recover non-economic damages for past and future pain and suffering resulting from a defendant's wrongful conduct.  See, e.g., *Capelouto v. Kaiser Foundation Hospital*, 7 Cal.3d 889, 892-93 (1972).  The determination of such damages is left to the sound discretion of the trier of fact, yet must be reasonable based on the evidence presented at trial and all relevant circumstances.  See, e.g., *Capelouto*, 7 Cal.3d at 892-93; *Duarte v. Zachariah*, 22 Cal.App.4th 1652, 1664-65 (1994).

82.    Cantu seeks non-economic damages of $100,000 to compensate him for the significant pain and suffering he experienced as a result of the shoulder injury and pain and anxiety caused by his family's "uncertain financial future" due to the loss of opportunity for advancement that followed the accident.[277]

83.    Although Cantu was clearly injured in the accident, the evidence does not support his arguments concerning the severity of the injuries or their likely future impact on his life.  As noted, much of the medical treatment Cantu received in the 47 weeks following the accident was unnecessary; moreover, it does not appear likely that future treatment is medically necessary. It is also speculative that Cantu would have had guaranteed advancement opportunities had the accident not occurred.  Nonetheless, it is clear that an injury of this type can cause pain, and that a period of time out of work can give rise to anxiety and stress,  particularly related to any attendant financial hardships related to being out of work.  Based on Cantu's testimony concerning these subjects,[278] and the inferences that arise from the nature of his injuries, the court finds that Cantu's non-economic damages for pain and suffering were $15,000.

### 3.    Total Damages Recoverable

84.    In sum, the court finds that, based on the evidence, Cantu proved damages of $52,411.50.

---

[277]Cantu Brief at 26-27.

[278]See May 5 Morning RT at 84:16-22 ("Q. With respect to your injury, did that place any difficulties with your family? A. Yes, many. Q. Did it create any strife between you and your family? A. Yes. Q. What caused the strife?  Was it economic?  Pain?  What?  A. Economic hardship").

85.   Accounting for Cantu's comparative fault, his total recoverable damages are reduced to $15,723.45.

86.   Any finding of fact that is deemed a conclusion of law is incorporated herein as such.

### III.  CONCLUSION

For the reasons stated, the court concludes that the United States of America is liable for negligence in connection with the collision occurring on April 18, 2011 at the SSA Terminal at the Port of Long Beach.  The court further concludes, however, that plaintiff was negligent in the operation of his vehicle and that such negligence was a substantial factor contributing to his injuries.  To reflect plaintiff's comparative fault, the court allocates 70 percent of the fault to plaintiff and 30 percent of the fault to the United States of America.  The court awards plaintiff total damages of $15,723.45, which have been discounted to reflect plaintiff's proportionate share of fault.

DATED: August 7, 2015

_____
MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE